UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**BRIAN LOCK,**

          **Plaintiff,**

**v.**                                                  **Case No:  6:12-cv-680-Orl-36TBS**

**CITY OF WEST MELBOURNE, FLORIDA,**
**STEPHANY ELEY, MICHAEL HAZLETT,**
**and HAL ROSE,**

          **Defendants.**

_____

## ORDER

This cause comes before the Court on four motions for summary judgment on Plaintiff Brian Lock's ("Lock") Second Amended Complaint:  (1) Defendant Stephany Eley's ("Eley") Motion for Summary Judgment (Doc. 66); (2) Defendant Michael Hazlett's ("Hazlett") Motion for Summary Judgment (Doc. 67); (3) Defendant Hal Rose's ("Rose") Motion for Summary Judgment (Doc. 68); and (4) Defendant City of West Melbourne's ("City") Motion for Summary Judgment (Doc. 69).[1]  Lock filed responses in opposition to the City's Motion for Summary Judgment and the Individual Defendants' Motions for Summary Judgment (Docs. 95, 99), and the Individual Defendants replied in further support of their Motions (Doc. 108).  Having determined that oral argument is unnecessary, this matter is ripe for review.  Upon due consideration of the parties' submissions, including deposition transcripts, affidavits, memoranda of counsel and accompanying exhibits, and for the reasons that follow, the Court will grant the City's Motion for Summary Judgment as to Lock's federal law claims, and those claims will be

---

[1] Eley, Hazlett, and Rose are collectively referred to as the "Individual Defendants" and, together with the City, the "Defendants."

dismissed with prejudice.  The Court will deny the remainder of the City's Motion for Summary Judgment, and the entirety of the Individual Defendants' Motions for Summary Judgment, without prejudice, because the Court will decline to exercise supplemental jurisdiction over Lock's state law claims.

## I.      BACKGROUND

### A.      Statement of Facts[2]

#### 1.      Introduction

This action arises from Lock's termination from his position as Chief of the City's Police Department by a 5-2 vote of the City Council on May 3, 2012.  JSF, ¶¶ 1, 22; JPS, p. 23.  Lock had been employed by the City since December 30, 1980, and had served as Chief of Police since January 6, 1990.  JPS, p. 23.  At the time of his termination, Lock also served as a commissioner on the Criminal Justice Standards and Training Commission ("CJSTC"), a unit of the Florida Department of Law Enforcement ("FDLE") that is responsible for overseeing investigations and discipline arising from law enforcement officer misconduct, and for determining final disciplinary action against officers.  JSF, ¶ 18; Docs. 66-1, 66-2, Deposition of Brian Lock ("Lock Dep."), 21:18–22:20.  At all relevant times, Defendants Eley and Hazlett served as council members on the City Council, while Defendant Rose served as the City's mayor and, as such, was a voting member on the City Council.  JPS, p. 23; Doc. 69-4, Affidavit of Hal Rose ("Rose Aff."), ¶ 2.  Eley, Hazlett, and Rose each voted in favor of Lock's

---

[2] This Statement of Facts is derived primarily from the parties' Joint Stipulation of Undisputed Facts ("JSF") (Doc. 106), the Joint Final Pretrial Statement ("JPS") (Doc. 127), the deposition testimony and affidavits of various individuals, and accompanying exhibits.  The testimony of the parties differs with respect to the events leading up to Lock's termination.  At this stage, the Court is obliged to construe the facts in the light most favorable to Lock.  *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).

termination.  *See* Rose Aff., ¶ 3; Doc. 69-5, Affidavit of Stephany Eley ("Eley Aff."), ¶ 3; Doc. 69-6, Affidavit of Michael Hazlett ("Hazlett Aff."), ¶ 3.

Lock's employment agreement with the City provided that Lock could only be terminated "for cause"[3] upon "a majority (4) vote of the [City] Council at a properly noticed meeting wherein Lock shall be afforded a hearing."[4]  Doc. 43-1, p. 8.  The Defendants maintain that Lock's termination was the result of his failure to properly investigate and report a theft of prescription drugs by his subordinate, Charles Schrum ("Schrum"), and Lock's alleged efforts to obtain a pension for Schrum after the theft.  *See* Docs. 66–69.  The Defendants believe that Lock's actions and inactions were part of a deliberate effort by him to cover up Schrum's theft and ensure that Schrum received a pension due to their friendship.  *See id.*  Lock, on the other hand, claims that the actual reason he was terminated was because of his refusal to fire another subordinate, James Michael Helms ("Helms"), who was a political rival of Hazlett, Eley, and Rose, as well as Lock's perceived political alignment against the trio.  *See* Docs. 95, 99.

Under the City's Charter, the City Council has the sole authority to terminate individuals it appoints to office, such as the Chief of Police.  *See* West Melbourne, Fla., Charter art. III, § 1(b) & art. XI, § 1, *available at* http://library.municode.com/index.aspx?clientId=11693. However, the authority to hire and fire all other City employees lies exclusively with the City Manager.  *See id.*, art. V, § 4(a).  The City's Charter further provides:  "Except for the purpose of inquiries and investigations, the city council and its members shall deal with the city officers and

---

[3] Under the employment agreement, "for cause" was defined as, among other things, "malfeasance or misfeasance in the performance of his official duties."  Doc. 43-1, p. 8.

[4] Before April 6, 2010, Lock had been performing under an employment agreement with the City that permitted the City to terminate him at will.  *See* Doc. 43-1, pp. 1–5.  However, on that date, Lock entered into the new employment agreement with the City which provided that he could only be terminated "for cause."  *See id.* at 6–8.

employees who are subject to the direction and supervision of the city manager solely through the city manager, and neither the city council nor its members shall give orders to any such officer or employee, either publicly or privately." *Id.*, art. III, § 8(b).  Under City policies, department heads, such as the Chief of Police, may make recommendations to the City Manager regarding whether to hire or fire a City employee, but the City Manager retains ultimate authority in making the decision.  Doc. 78, Deposition of Scott Morgan ("Morgan Dep."), 7:13–8:9.

City policies prohibit the City from terminating an employee due to his support of any political candidate for office. *Id.* at 69:20–22.  City policies also provide that "[e]very employee has the right to express his or her views as a citizen and to cast a vote.  Coercion of or by an employee for political purposes and using the position of employment for political purposes is prohibited."  Doc. 99-4.

### 2.   *The Schrum Incident*

In January 2005, Schrum, a lieutenant in the City Police Department, was involved in a one-car accident while driving a City-owned police vehicle.  JSF, ¶ 4.  After Schrum admitted to Lock that he had used a prescription pain killer before the accident, Lock recommended to the City Manager at the time, Mark Ryan ("Ryan"), that Schrum be demoted from lieutenant to sergeant. *Id.* at ¶ 5; *see* Doc. 69-1, p. 4.  Ryan ultimately decided not to demote Schrum, but he did impose an unpaid ten-day suspension.[5]  JSF, ¶ 6.

Over four years later, on June 18, 2009, Helms, the Director of Support Services for the City's Police Department, was conducting a routine review of feeds from the surveillance cameras located throughout the Police Department building, when he noticed that one of the cameras in the evidence room had been pushed upward from its usual position. *Id.* at ¶ 3; Doc.

---

[5] Ryan also ordered Schrum to reimburse the City for the insurance deductible resulting from the accident, directed him to enroll in the City's Employee Assistance Program, and placed him on probationary status for one year.  JSF, ¶ 6.

66-3, Deposition of James Michael Helms ("Helms Dep."), 23:3–14.   Upon reviewing the previous day's recordings by that camera, Helms observed Schrum enter the evidence room, push the camera upward, and then put something that had been stored in the room in his pocket. Helms Dep., 23:14–24.  Helms immediately notified Michael Czernik ("Czernik"), the Assistant Chief of Police, who, upon viewing the recordings, told Helms to make copies.  *Id.* at 23:25–24:5; JSF, ¶ 2.

The next morning, Czernik and another officer re-positioned the camera to its original position.  Helms Dep., 24:5–9.  Later that day, while Czernik and Helms were watching the live camera feed during the lunch break, they observed Schrum enter the evidence room with a cart, place a number of bags on the cart, and then exit the room with the cart.  *Id.* at 26:18–28:14. Czernik then approached Schrum in the hallway and instructed him to put the bags back in the evidence room and not to go back into the room until further notice.  *Id.* at 28:15–23.  Czernik made a phone call to Lock, who was in his car, and told him that Schrum had been observed repositioning the evidence room surveillance camera in a suspicious manner.  JSF, ¶ 7.  Lock told Czernik to change the locks to the evidence room and that Czernik should hold the only key. *Id.*; Lock Dep., 101:25–102:11.

Later that day, Helms called Lock and told him that Helms was with an employee who was in trouble and needed help.  JSF, ¶ 8.  Lock agreed to meet Helms and the troubled employee in the parking lot of a local coffee shop.  *Id.*  Upon his arrival, Lock observed Schrum in Helms's car in an extremely emotional state.  *Id.*  Schrum told Lock that he had a drug problem and needed help.  *Id.* at ¶ 9.  Helms and Lock drove Schrum to a drug treatment facility, where Schrum was admitted.  *Id.* at ¶ 10.  Immediately before entering the facility, Schrum admitted to Lock that he had taken narcotic drugs from the evidence room.  *Id.* at ¶ 11.

Four days later, on June 23, 2009, Schrum sent Lock a memorandum announcing his decision to request a medical/disability retirement, citing "knee[], back, and other problems." *Id.* at ¶ 13; *see* Doc. 69-1, p. 8. That same day, Lock provided Schrum with written notice that Schrum's law enforcement authority had been removed. JSF, ¶ 13; *see* Doc. 69-1, p. 9. Shortly thereafter, Schrum was admitted to a long-term, out-of-state treatment facility. Lock Dep., 99:8–10. After his admission to the initial drug treatment facility, Schrum never returned to duty, and remained on unpaid leave from his work with the City until his employment ended. *Id.* at ¶ 12.

After learning that Schrum had taken narcotic drugs from the evidence room, Lock informed the State Attorney, Norm Wolfinger ("Wolfinger"), in July 2009. Lock Dep., 117:10–17. Wolfinger expressed concern that Schrum's confession to Lock may be inadmissible in any criminal proceeding against Schrum under *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967).[6] Lock Dep., 167:11–20. Wolfinger told Lock to have Czernik prepare an informational report and send it to the Chief Assistant State Attorney, Wayne Holmes ("Holmes"). *Id.* at 109:17–110:1. Pursuant to Wolfinger's instructions, Lock ordered Czernik to begin a criminal investigation of Schrum's conduct. Lock Dep., 98:20–100:16. Lock did not order an internal affairs investigation separate from the criminal investigation, even though he understood that he had a duty to perform an internal affairs investigation pursuant to the Florida Administrative Code.[7] *Id.* at 105:25–106:6, 130:9–18. As part of the criminal investigation, Lock ordered

---

[6] *Garrity* held that coerced statements obtained from a police officer under threat of removal from office cannot be used in subsequent criminal proceedings against the officer. 385 U.S. at 493.

[7] Subsection 11B-27.003 of the Florida Administrative Code requires a law enforcement agency to conduct an investigation when it has cause to suspect that an officer has, among other things, failed to maintain good moral character as defined under subsection 11B-27.0011(4), which includes the perpetration of a felony, regardless of whether the officer has been criminally prosecuted. *See* Fla. Admin. Code Ann. r. 11B-27.003(1), 11B-27.0011(4)(a). If the agency concludes that there has been a violation of those provisions, it must send to the CJSTC a

Czernik to perform an audit of the evidence room, and to review the surveillance footage and save any suspicious videos for future evidentiary use. *Id.* at 100:14–101:4, 106:16–107:1. The audit revealed that two pill bottles in the evidence room did not contain the same number of pills that the officer submitting the bottles had indicated in his initial report. *Id.* at 107:4–16. Those pill bottles were in the evidence room after being seized following an unattended death, rather than during a criminal investigation.[8] *Id.* at 112:23–113:16; Doc. 73, Deposition of Wayne Holmes ("Holmes Dep."), 18:2–6.

On September 16, 2009, Lock sent a Confidential Information Report to Holmes reporting Schrum's admitted theft of narcotic drugs from the evidence room. JSF, ¶ 15; *see* Doc. 69-1, pp. 19–21. The Confidential Information Report had Lock's signature and contained a handwritten note on the last page stating: "WAYNE – NORM HAD MENTIONED SOME CONCERN ABOUT GARRITY . . . . THANKS, BRIAN". *See* Doc. 69-1, p. 21. Lock testified that the purpose of this note was to inform Holmes that Wolfinger had already expressed concern about the admissibility of Schrum's confession under *Garrity*. Lock Dep., 167:5–20. The following day, Holmes had a phone conversation with Lock, Czernik, and Helms. Holmes Dep., 16:21–17:1. Holmes expressed concern about the *Garrity* issue, and also stated that there was a *corpus delicti* issue because prosecutors would be unable to prove that any missing pills had not simply been flushed down the toilet pursuant to the City Police Department's practice. *Id.* at 16:21–17:10, 18:1–20:15. However, Holmes could not conclusively say that the State

completed Internal Investigation Report form CJSTC-78 ("Form CJSTC 78") within 45 days of reaching its conclusion, regardless of whether any criminal action is pending or contemplated. *See* Fla. Admin. Code Ann. r. 11B-27.003(2).

[8] After the death of an individual who was in hospice care or otherwise unattended by a physician, City police officers would gather the medications from the site of the death and store them in the evidence room for ultimate disposal, rather than for any criminal investigation. Holmes Dep., 18:2–11. The practice of the City Police Department was to flush those medications down the toilet when the evidence room became too crowded. *Id.* at 18:11–16.

Attorney's Office would be unable to pursue criminal charges against Schrum.  *Id.* at 17:1–4.

Holmes believed that he needed further evidence, so he asked for sworn statements from Czernik

and Helms, video recordings of Schrum's removal of items from the evidence room, and a

written inventory identifying the particular items of evidence that were missing.  *Id.* at 17:11–25,

21:9–13, 21:19–24.  Approximately one month after his request, Holmes had not received the

items he requested, so he spoke with Lock, who assured Holmes that the items would be sent.

*Id.* at 33:11–21.  Several months later, Holmes still had not received the items he requested, so

he placed the Confidential Information Report in a storage file on January 28, 2010.  *Id.* at

15:10–16:18, 21:14–22:1, 32:11–33:7.  To date, Holmes has not received the items he requested.

*Id.* at 32:20–33:7.

Approximately one week after Schrum's admission to the drug treatment facility, while

the criminal investigation was ongoing, Schrum sent Lock an email inquiring about his eligibility

for a pension.  Lock Dep., 112:14–20.  On August 20, 2009, Lock sent Schrum a letter stating

that Schrum's position was being eliminated, effective September 30, 2009, as a result of budget

cuts.[9]  JSF, ¶ 14; *see* Doc. 69-1, p. 10.  Lock wrote:  "This action is permanent and the position

will not be funded in our 2009-2010 budget; therefore, it is imperative that you expedite the

necessary paperwork for the retirement options for the Police Pension Board since you will not

be returning to employment with the Police Department."  Doc. 69-1, p. 10.  On September 17,

2009, Lock sent Schrum a letter stating:  "Regarding your application for disability pension, I

recommend that you consult with your primary orthopedic physician and possibly provide him

with a job description for Police Commander so that he can render a written opinion as to

---

[9] Lock testified that City officials were also considering eliminating two other law enforcement
positions.  Lock Dep., 99:19–100:4.

whether you can perform the duties required.  This may assist the Pension Board in its decision." *Id.* at 11.  Lock enclosed job descriptions and a sample letter from a physician.  *See id.*

Schrum's disability pension application was eventually approved by the City's Police Pension Board (the "Pension Board") on February 3, 2010.  JSF, ¶ 16; *see* Doc. 69-1, pp. 13–18. Lock testified that he did not inform the City Council, the City Manager, or the City Attorney about the Schrum incident because Bonni Jensen ("Jensen"), an attorney for the Pension Board, told him that the City could withhold Schrum's pension only upon a felony conviction, and Lock believed that a felony conviction was unlikely under the circumstances.  Lock Dep., 132:6– 135:15, 136:13–20, 138:23–139:20, 142:11–19.  Jensen, however, testified that Lock never told her exactly why Schrum was being investigated and that, under a provision of the City code, if a law enforcement officer is terminated for admitted theft from the City, the officer's pension is forfeited, regardless of whether the officer has been convicted.  Doc. 74, Deposition of Bonni Jensen, 14:11–22, 23:2–22; *see* West Melbourne, Fla., Code of Ordinances § 34-93(a)(2), *available at* http://library.municode.com/index.aspx?clientId=11693.

### 3.    *Lock's Refusal to Fire Helms and His Perceived Political Alignment Against Hazlett, Eley, and Rose*

In September 2010, Helms made a $100 cash campaign donation to Rose's political opponent, William Mettrick ("Mettrick"), for the upcoming mayoral election.  Helms Dep., 65:16–66:5; Doc. 77, Deposition of William Mettrick ("Mettrick Dep."), 10:13–24.  Even though Rose, the incumbent, would defeat Mettrick in the election, Rose, Hazlett, and Eley criticized the donation as improper, believing that Helms was attempting to assert influence based on his position in the Police Department.  Doc. 70, Deposition of Stephany Eley ("Eley Dep."), 35:15– 38:5; Mettrick Dep., 5:12–25, 13:15–14:14; Helms Dep., 65:16–66:12, 69:9–11; Doc. 96, Affidavit of Terri Leigh Jones ("Jones Aff."), ¶ 10.  According to Eley, the donation was brought

up at City Council meetings "more than once." Eley Dep., 35:15–25.[10]  Rose eventually met

with Lock and "strongly expressed" that he was unhappy with the donation and the fact that

Lock had not taken action against Helms.  Lock Dep., 218:12–20.

The following year, Mettrick, John D'Amico ("D'Amico"), Andrew Jones ("Andrew

Jones"), Andrea Young ("Young"), John Tice ("Tice"), and Deborah Raskett ran for the three

open positions on the City Council held by incumbents D'Amico, Andrew Jones, and Young.

Jones Aff., ¶ 18; Mettrick Dep., 5:6–8.  Hazlett, Eley, and Rose, whose City Council positions

were not up for election that year, supported Tice.  Doc. 71, Deposition of Michael J. Hazlett

("Hazlett Dep."), 95:23–96:7; Jones Aff., ¶ 22.  In July 2011, a few months before the election,

the West Melbourne Citizens Police Academy Alumni Association ("Police Alumni

Association"), a City-funded non-profit organization of which Mettrick was the president and

Helms was the Police Department liaison, published a brochure to promote awareness about the

organization's support of the Police Department.  Mettrick Dep., 18:16–19:14.  The brochure,

which was distributed to the City Council members and current and former Police Department

officers, included photographs of Mettrick and Helms.  *Id.* at 19:2–23.  Hazlett and Eley

construed the brochure as an attempt by the Police Department to officially endorse Mettrick,

even though the brochure did not specifically mention Mettrick's candidacy.  Eley Dep., 43:4–

44:20.  On July 27, 2011, Hazlett sent an email to Lock which denounced the brochure as a

political tactic to promote "the beginning of the Bill Mettrick upcoming November election

season."  Doc. 99-1, p. 1.  In the email, Hazlett stated that he would be forwarding the brochure

to the Brevard County Supervisor of Elections and the "Election Ethics folks in Tallahassee" for

---

[10] Eley and Hazlett also encouraged a local businesswoman to file a complaint with the Florida
Elections Commission ("FEC") on the grounds that the donation violated rules prohibiting
campaign donations of more than $50 in cash.  Mettrick Dep., 10:22–17:2.  Mettrick eventually
settled the matter with the FEC for a small fine.  *Id.* at 16:4–10.

investigation. *Id.* In a series of follow-up emails, Hazlett stated his intention to place the City's

funding of the Police Alumni Association on the City Council's next meeting agenda, because he

believed that the organization was "organized for one reason and one reason only – the election

of a political candidate for the office of City Council and that focus is on one single candidate,

Mr. Bill Mettrick." *See id.* at 2–5. At its August 16, 2011 meeting, on a motion raised by

Hazlett and seconded by Eley, the City Council voted 5-2 to discontinue the City's funding of

the Police Alumni Association, with Rose, Hazlett, and Eley voting in the majority. *See id.* at 6,

14–16.

After the City Council vote, Hazlett continued to express concern over Helms. On

August 29, 2011, Hazlett sent Lock an email that stated, in pertinent part:

> Mr. Helms, in my view, has been able to run rogue politically in our city for far to
> [sic] long and put his time & efforts in area's [sic] he has no business asserting
> himself. . . . I now see his 'cheer-leading' as that of a corrupt, union-thug pushing
> a very specific agenda and clearly leaving the balance of the city to fall to the
> chopping block as long as his agenda, and that of the Police department he
> represents, is addressed. . . . I believe my position on this management employee
> is very clear at this point and hope you further consider the opinions of those
> outside the [Police Department] looking at this specific issue, especially the folks
> elected to lead our city.

*Id.* at 18. In the email, Hazlett requested that Lock break down the Police Department's budget

and list the individual salaries of all six members of the Police Department's executive team,

including Helms, instead of listing their combined salaries under an "Executive Wages" heading.

*See id.* at 19. Lock provided the breakdown requested by Hazlett, but expressed concern over

the personal nature of the comments that Hazlett made toward Helms. *See id.* at 20–21. In

response, Hazlett sent an email to Lock criticizing him for "defend[ing]" Helms. *Id.* at 20. The

email further stated:

> Your continued endorsement, whether private or public, of those candidates that
> will give your department 'whatever' it requests may have worked in the past –
> but as it's been said over and over lately in local government, "Its [sic] a new

normal and the dollars that once flowed freely exist now under very tight public scrutiny".  May I also remind you sir to take another look at the Charter of this city, especially the section pertaining to the elected leadership, as the chartered officers are accountable to a City Council & a Mayor.  Lets [sic] stop dancing around the reality as it now exists – I once considered us friends Brian, but now realize *that* friendship was only consistent when the [Police Department] was getting what it wanted. . . .  Naturally I can only speak for myself when I say this but the days of the Police department being the 'big pig' in the line at the local buffet and leaving very little for the others in that same line are quickly coming to an end.

*Id.*

On September 19, 2011, Hazlett and Rose received an email[11] from a "Ryan Cunningham," written in the form of an allegory, which blamed the Police Department's allegorical woes on Helms, and which urged Lock:  "rid yourself and your kingdom of the poison that Helms brings."  *See id.* at 22–23.  The next day, while discussing the City's 2011-2012 fiscal year budget at a City Council meeting, Eley made a motion, seconded by Hazlett, to modify the proposed budget by de-funding Helms's position.  Doc. 95, pp. 29–32.  After several citizens spoke out against de-funding Helms's position and criticized the personal comments made by Hazlett toward Helms, the motion was tabled by a 4-3 vote, with Rose, Eley, and Hazlett in the minority.  *Id.* at 30–33.  The City Council eventually passed a budget retaining Helms's position by a 4-3 vote, again with Rose, Eley, and Hazlett in the minority.  *Id.* at 36.  Lock avers that during a break in the proceedings, Eley approached him and told him that if Lock did not fire Helms, she would "get rid of" Lock.  *See* Lock Dep., 186:25–188:4; Jones Aff. ¶ 26.  Shortly after the conclusion of the meeting, Hazlett sent Lock an email accusing him of "bring[ing] in a bunch of pure union thugs from New York" to obtain budget concessions for the police officers' union.  Doc. 99-1, p. 24.

---

[11] The email was made publicly available by Hazlett, allegedly because it was sent on the City's server.  *See* Doc. 99-1, p. 22.

In a series of emails after the budget vote, Hazlett continued to criticize Lock for attempting to form a police officers' union. Hazlett also continued to accuse Lock and Helms of supporting Mettrick and D'Amico in the upcoming election. On September 30, 2011, Hazlett sent group emails to his friends criticizing D'Amico for representing himself as a Republican when D'Amico had previously served as a Democrat in the Rhode Island state senate. *See id.* at 26–29. In one of the emails, Hazlett accused D'Amico of "using" Lock to get re-elected, and stated that "Chief Lock will live to regret the day he packed our house with unwanted union thugs to rudely shout down our democracy with there [sic] entitlement attitudes & terrible profanity." *Id.* at 27. Hazlett also wrote: "To Mike Helms – make sure your team and 2 candidates get a copy of this email . . . I have only just begun to alert the voters in West Melbourne." *Id.* at 28. On October 23, 2011, Hazlett wrote an email directed toward D'Amico, stating that "[t]he City Council saw right through your corrupt little scam organization, sadly using our Police Dept. and many good folks who wanted a 'real' alumni [organization], to get your buddy, Bill Mettrick, elected." *Id.* at 30. On October 31, 2011, after being pulled over by West Melbourne police officers in a traffic stop, Hazlett wrote an email to Lock and other City officials, accusing Lock of orchestrating the traffic stop because Hazlett had opposed the budget concessions. *See id.* at 34–35. In the email, Hazlett stated: "I no longer trust our Police Chief at all. I believe he now has taken the strategy, with his political pal Helms, to simply harass me and use his badge to run me off. . . ." *Id.* at 34.

In the November 2011 election, Mettrick and Tice were elected, and Young was reelected, to the City Council, while D'Amico lost his bid for reelection. Jones Aff., ¶ 23. As a result of the election, Hazlett, Eley, Rose, and Tice obtained a ruling majority on the City Council. *Id.* at ¶ 24. Soon after the election, Terri Leigh Jones ("Jones"), a former Interim City

Attorney for the City and a friend of both Hazlett and Lock, received a phone call from Hazlett, who told her that he had heard a rumor that Lock had an affair with a sexual assault victim, and that he was going to "get details." *Id.* at ¶¶ 2–3, 28. After Lock denied the rumor to Jones, Jones relayed the denial to Hazlett. *Id.* at ¶ 31. Jones avers that Hazlett told her if Lock would just follow Hazlett's instructions to fire Helms, Lock would be "okay." *Id.* at ¶ 32. According to Jones, Hazlett said that he told Lock it would be better for Lock and the Police Department's budget if Helms were fired. *Id.* Jones claims that after she told Hazlett that Lock could not fire Helms because of his political affiliations, Hazlett said that he did not care because "his group had won the election and that is all that should matter." *Id.*

### 4.   The Anonymous Letter and Lock's Termination

In November 2011, after the election, Hazlett received an anonymous letter in the mail urging him to continue to place pressure on the Police Department and to fire Lock and Helms. Hazlett Dep., 66:9–67:5; *see* Doc. 99-1, pp. 36–37. The letter stated: "Check on how many times Damico [sic] and Mettrick are at the police department or how many times they call the Chief daily." Doc. 99-1, p. 36. The letter also raised the Schrum incident, which to that point in time had not been brought before the City Council members, and encouraged Hazlett to investigate the matter. *Id.* The letter implied that Lock had covered up Schrum's theft because they were friends, and that Lock helped Schrum secure a pension: "How about the best friend of Lock, a Commander that stole drugs from the police evidence room, a criminal act, but Locks [sic] absolute control over the three police officers on the police pension board (they didn't like it), the Commander and his drug problem now receives a very sweet retirement thanks to Lock and at the expense of the city taxpayers dollar. He should be in jail not get a pension, but Lock had it taken care of. . . ." *Id.*

After receiving the anonymous letter, Hazlett forwarded copies of the letter to City Manager Scott Morgan ("City Manager Morgan") and City Attorney Jim Wilson ("City Attorney Wilson") on November 14, 2011.  *See* Doc. 69-2, pp. 8, 27–29.  Hazlett also sent copies of the letter to the City Council members.  Eley Dep., 77:10–20.  On November 15, 2011, City Manager Morgan questioned Lock about the allegations in the letter.  *See* Doc. 69-2, p. 8; Lock Dep., 120:16–19.  That same day, Lock provided the FDLE with a completed Form CJSTC 78[12] regarding the Schrum incident.  *See id.* at 8, 30.  The completed Form CJSTC 78 indicated that Schrum had perpetrated a felony by removing prescription drugs from the evidence room without permission, and that an agency investigation concluded that Schrum's actions were a violation of agency regulations requiring officers to maintain good moral character.  *See id.* at 30.  Also that day, Schrum submitted an affidavit to the FDLE relinquishing his certification as a police officer.  *See* 69-1, pp. 22–23.

On November 17, 2011, Lock briefed the City Council members on the Schrum incident.  *See* Doc. 69-2, p. 8.  In the days following the briefing, Hazlett sent emails to Rose, City Manager Morgan, and City Attorney Wilson criticizing Lock for failing to turn over evidence related to the Schrum incident and accusing Lock of attempting a cover-up.  Doc. 99-1, pp. 38–39.  Hazlett and Eley were quoted in local media reports calling for Lock to resign.  *See id.* at 51–55; Hazlett Dep., 71:4–13, 74:13–19.  Schrum avers that Tice met with him and told him that "none of this would have been necessary if [Lock] had fired Helms."  Doc. 96, pp. 35–36, Affidavit of Charles Schrum, ¶¶ 2, 4.

On December 5, 2011, a special meeting of the City Council was held to determine whether Lock should be placed on administrative leave.  *See* Doc. 99-1, pp. 40–47.  The City

---

[12] *See supra* n.7.

Council voted 5-2 *not* to place Lock on administrative leave, with Hazlett and Tice voting in the minority. *Id.* at 47. In the same vote, the City Council agreed to hire an outside agency to conduct an investigation into the Schrum matter and to hire legal counsel to review the investigation. *Id.* On January 24, 2012, Hazlett sent City Attorney Wilson an email criticizing him for "playing both sides of this issue" and stating: "I want outside counsel, if that's the route we must now take, retained to explore how to terminate the Police Chief for not doing his job." *See id.* at 48–49.

On February 7, 2012, the City Council approved a negative performance evaluation for Lock by a 5-2 vote, with Hazlett, Eley, Rose, Tice, and Pat Bentley ("Bentley") in the majority. *See* Doc. 95, pp. 41, 52–53. At the meeting, the City Council also voted 4-3 to hold a due process hearing within 30 days with the intent of terminating Lock's employment contract, with Hazlett, Eley, Rose, and Tice in the majority. *See id.* at 53–56. The City Council directed outside counsel to draft an appropriate notice of the upcoming due process hearing for delivery to Lock, *see id.* at 56, and Lock acknowledges receipt of the notice. Lock Dep., 173:3–6.

During the interim period between the February 7, 2012 City Council meeting and the eventual due process hearing, City Council members continued to express displeasure over Helms's cash donation to Mettrick during the 2010 election campaign. On March 28, 2012, Hazlett sent an email to Mettrick threatening to file ethics charges against him and Helms as a result of Helms' cash donation to Mettrick during the 2010 election campaign. *See* Doc. 99-1, p. 64. In addition, Lock avers that during a City Council meeting held on April 17, 2012, Rose, while discussing the pending report from the City's outside legal counsel, said: "We didn't have to talk about, um, the illegal campaign contribution that was a first degree misdemeanor." Doc. 99-2, Affidavit of Brian Lock, ¶¶ 3–4.

On April 27, 2012, the City's outside legal counsel, Al McKenna ("McKenna"), issued his findings and opinions regarding Lock's actions and inactions in addressing Schrum's theft of prescription drugs from the evidence room.  *See* Doc. 69-2.  McKenna opined that Lock had committed "misfeasance" in the performance of his official duties by:  (1) failing to terminate or arrest Schrum following discovery of the theft; (2) assisting Schrum in obtaining a disability pension in spite of provisions of state law and the City code that would have arguably justified forfeiture of the pension; and (3) failing to report Schrum's theft to the City Council.  *See id.* at 1, 17.  McKenna therefore concluded that Lock could be terminated "for cause" under his employment contract.  *See id*.

On May 3, 2012, the City Council held a due process hearing to determine whether to terminate Lock's employment.  JSF, ¶ 22; Lock Dep., 173:11–16.  Lock was represented by counsel and had the opportunity to testify and present witnesses.  Lock Dep., 173:20–174:1.  At the conclusion of the hearing, the City Council voted to terminate Lock's employment by a 5-2 vote, with Hazlett, Eley, Rose, Tice, and Bentley in the majority.  JSF, ¶ 22.  Each of the City Council members who voted in favor of terminating Lock's contract avers that they did so due to Lock's failure to properly investigate and report the Schrum incident, as well as Lock's efforts to obtain a pension for Schrum, and not because of any political motivations.  *See* Rose Aff., ¶¶ 7, 13; Eley Aff., ¶¶ 7, 13; Hazlett Aff., ¶¶ 7, 13; Doc. 69-7, Affidavit of Pat Bentley, ¶¶ 7, 12; Doc. 69-8, Affidavit of John Tice, ¶¶ 7, 13.  Thereafter, the City denied Lock's request for a post-termination hearing, taking the position that such a hearing was not required under Lock's employment contract.  Doc. 95, p. 39.

### B.    Procedural History

On May 4, 2012, Lock filed a Complaint in this Court alleging various federal and state law claims against the City and the Individual Defendants.  *See* Doc. 1.  After obtaining leave of

court, Lock filed an Amended Complaint and, thereafter, a Second Amended Complaint.  *See* Docs. 30, 43.  The Second Amended Complaint asserts the following Counts:  (1) Count I – claim under 42 U.S.C. § 1983 for violation of Lock's First and Fourteenth Amendment rights to freedom of speech and association based on termination of employment due to political patronage (City); (2) Count II – claim under 42 U.S.C. § 1983 for violation of Lock's Fifth and Fourteenth Amendment rights to substantive due process (City); (3) Count III – claim under 42 U.S.C. § 1983 for violation of Lock's Fifth and Fourteenth Amendment rights to procedural due process (City); (4) Count IV – breach of contract (City); (5) Count V – intentional infliction of emotional distress (Hazlett, Eley, and Rose); (6) Count VI – tortious interference with a contractual relationship (Hazlett, Eley, and Rose); (7) Count VII – violation of Fla. Stat. § 448.045 (Hazlett, Eley, and Rose).  *See* Doc. 43.  Subsequently, the City and each Individual Defendant filed the instant Motions for Summary Judgment.  *See* Docs. 66 – 69.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact.  *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact.  *Id.* at 324.  Issues

of fact are genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.  A fact is "material" if it may affect the outcome of the suit under governing law. *Id.* at 248.  In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party.  *Id.* at 255.

## III.   DISCUSSION

### A.   Political Patronage Termination

The practice of dismissing employees on a partisan basis is one form of the longtime practice of political patronage.  *Elrod v. Burns*, 427 U.S. 347, 353 (1976).  Despite its historical presence, the Eleventh Circuit has recently acknowledged that "First Amendment jurisprudence in the area of firings based on political affiliation or candidacy is, at best, muddled."  *Underwood v. Harkins*, 698 F.3d 1335, 1338 (11th Cir. 2012), *cert. denied*, 134 S. Ct. 99 (U.S. 2013).  In its attempts to harmonize the existing caselaw, the Eleventh Circuit has approached this area of the law by first discussing Supreme Court cases on the subject, and then analyzing its own precedent.  *See id.* at 1338–42; *Randall v. Scott*, 610 F.3d 701, 710–13 (11th Cir. 2010).  This Court will take the same approach in considering Lock's claim that he was terminated in violation of his First Amendment rights of association due to his actual or perceived political alignment against a majority of the City Council.

In *Elrod*, the Supreme Court, by a 5–3 vote, held that a newly-elected county sheriff could not issue wide-ranging terminations for employees who were not sponsored by, or affiliated with, his political party.  427 U.S. at 373.  As the Eleventh Circuit has noted, *see Underwood*, 698 F.3d at 1339, the controlling rationale for the Supreme Court's decision was

that a "nonpolicymaking, nonconfidential employee" could not "be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs."[13]  *Elrod*, 427 U.S. at 375 (Stewart, J., concurring).

Thereafter, in *Branti v. Finkel*, 445 U.S. 507, 519 (1980), the Supreme Court held that the continued employment of an assistant public defender could not be conditioned on his allegiance to the political party in control of the county government.   The Supreme Court appeared to retreat from the standard introduced in *Elrod*, declaring that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."  *Id.* at 518.  Nevertheless, the *Branti* Court proceeded to address whether the assistant public defender was a policymaking and confidential employee.[14]  *Id.* at 519–20.

The Supreme Court has since summarized *Elrod* and *Branti* as standing for the proposition that "[g]overnment officials may not discharge public employees for refusing to support a political party or its candidates, unless political affiliation is a reasonably appropriate requirement for the job in question."  *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996).

In accord with these precedents, the Eleventh Circuit has utilized a balancing test between a discharged employee's First Amendment right to support a candidate, elected official,

---

[13] The Eleventh Circuit has interpreted the term "confidential employee" to mean one who occupies a position with access to confidential information, such that the employing official must have absolute trust and confidence in, and must expect undivided loyalty from, the employee. *Underwood*, 698 F.3d at 1342 (citing *Stegmaier v. Trammell*, 597 F.2d 1027, 1039–40 (5th Cir. 1979)).

[14] As a result, the Eleventh Circuit has observed that it is unclear "whether the language in *Branti* purporting to substantively reformulate the *Elrod* standard is dicta."  *Underwood*, 698 F.3d at 1339.

or political party, and the state's interest in office loyalty.  *See Randall*, 610 F.3d at 713.

However, with respect to policymaking or confidential employees, the Eleventh Circuit has

interpreted Supreme Court precedent as categorically permitting the dismissal of these

employees on the basis of political affiliation or belief "because the government has 'a

compelling interest in infringing [their] First Amendment rights.'"  *Leslie v. Hancock County Bd.*

*of Educ.*, 720 F.3d 1338, 1347 (11th Cir. 2013) (quoting *Rutan v. Republican Party of Ill.*, 497

U.S. 62, 71 n. 5 (1990)); *see Underwood*, 698 F.3d at 1343–44.

In differentiating between policymaking and non-policymaking employees, the Supreme

Court has observed:

> No clear line can be drawn between policymaking and nonpolicymaking
> positions.    While   nonpolicymaking   individuals   usually   have   limited
> responsibility, that is not to say that one with a number of responsibilities is
> necessarily in a policymaking position.   The nature of the responsibilities is
> critical.  Employee supervisors, for example, may have many responsibilities, but
> those responsibilities may have only limited and well-defined objectives.   An
> employee with responsibilities that are not well defined or are of broad scope
> more likely functions in a policymaking position.   In determining whether an
> employee occupies a policymaking position, consideration should also be given to
> whether   the   employee   acts   as   an   adviser   or   formulates   plans   for   the
> implementation of broad goals.

*Elrod*, 427 U.S. at 367–68.   Ordinarily, the determination as to whether an employee is a

policymaking or non-policymaking employee is a question of fact.  *Leslie*, 720 F.3d at 1349.

Here, however, there is no genuine issue of material fact, as it is clear that Lock, as Chief of

Police, was a policymaker for the Police Department.  Indeed, Lock has admitted as much.  *See*

Lock Dep., 17:16–18.  The City Charter granted him broad authority to "aid in the enforcement

of order and enforce the city's ordinances; . . . execute all papers and processes of the city or its

authorities, and . . . perform such other duties as may be lawfully required of him."  *See* West

Melbourne, Fla., Charter art. XI, § 2.  Pursuant to the authority granted to him by the Charter and

City policies, Lock was responsible, together with the City Council and the City Manager, for

setting goals for the Police Department and formulating plans for how to achieve those goals. Lock Dep., 17:24–19:3.  Therefore, it cannot reasonably be argued that in his position, he was not a policymaker.  *See Elrod*, 427 U.S. at 367–68.  Plaintiff was the City's Chief of Police and he reported directly to the City Council. Because Lock was a policymaker, the City was justified in terminating him based on actual or perceived political differences between him and a majority of the City Council.  *See Leslie*, 720 F.3d at 1347.  The five City Council members who voted in favor of terminating Plaintiff did not believe that Plaintiff could be trusted to act in the City's best interest in the future.  *See* Rose Aff., Eley Aff., Hazlett Aff., Tice Aff.  The City is therefore entitled to summary judgment on Lock's First Amendment claim.

## B.    Substantive Due Process

The Due Process Clause of the Fourteenth Amendment prohibits the states from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  "The substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'" *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)).  "A finding that a right merits substantive due process protection means that the right is protected against certain government actions regardless of the fairness of the procedures used to implement them.'"  *Id.* (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).  In this case, Lock asserts that the City violated his substantive due process rights by depriving him of his "contractual property right" to continued employment by arbitrary and pretextual means. Doc. 43, ¶¶ 30–36. The City argues that Lock's substantive due process claim completely overlaps with his First Amendment claim, and therefore must be analyzed under First Amendment standards rather than the more generalized notion of substantive due

process.[15]  *See* Doc. 69, pp. 20–21 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) ("[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.")). In response, Lock maintains that his substantive due process claim arises from his Fifth and Fourteenth Amendment property rights created by his employment contract, and therefore differs from his First Amendment claim.  *See* Doc. 95, pp. 19–20.

Even if the Court were to accept Lock's argument that his substantive due process claim should be analyzed separately from his First Amendment claim, his claim would be completely foreclosed by the Eleventh Circuit's decision in *McKinney*.  In *McKinney*, the plaintiff alleged that he was terminated from his position as a county building official because the county commissioners were biased against him due to his strict enforcement of the county's building codes.  20 F.3d at 1554.  The county's policies provided that a county employee could only be terminated "for cause," including incompetence or inefficiency in carrying out his duties.  *Id.*  In accord with the policies, the county provided the plaintiff with written notice of his proposed termination and the reasons therefor, and held a hearing to consider the charges.  *Id.* at 1554–55. The plaintiff attended the hearing, with counsel, and had the opportunity to hear the charges against him, cross-examine the county's witnesses, and present his own case.  *Id.* at 1555.  After the county commissioners upheld the charges against the plaintiff and terminated his employment, the plaintiff brought an action under 42 U.S.C. § 1983 alleging that the charges against him were pretextual and that he had therefore been denied substantive due process of law.  *Id.*  On appeal, the Eleventh Circuit, sitting en banc, overruled prior decisions of its panels

---

[15] The Court has already performed this analysis, concluding that Lock's First Amendment claim is without merit.  *See supra*, Part III.A.

and held broadly that a government employee possessing a state-created property interest in his employment, such as the plaintiff before it, states only a procedural due process claim, rather than a substantive due process claim, when he alleges that he was deprived of that employment interest by an arbitrary and capricious non-legislative government action.  *Id.* at 1560.  The *McKinney* court explained that since employment rights are state-created rights and are not "fundamental" rights created by the Constitution, they do not enjoy substantive due process protection.  *Id.*

The holding in *McKinney* is directly applicable here.  Lock had a state-created property right, via his employment contract, to continued employment with the City unless and until the City terminated him "for cause."  *McKinney* teaches that, contrary to Lock's argument, *see* Doc. 95, p. 21 n.30, his right to employment with the City was therefore not a "fundamental" right created by the Constitution.  20 F.3d at 1560.  Thus, in alleging that he was deprived of this right by arbitrary and pretextual means, he merely states a procedural due process claim.  *See id.*  His substantive due process claim must therefore be dismissed.

## C.    Procedural Due Process

The procedural component of the Due Process Clause requires that the state provide fair procedures and an impartial decisionmaker before infringing on a person's interest in life, liberty, or property.  *Id.* at 1561.  Specifically, a "'tenured employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story' before a state or state agency may terminate an employee.  In other words, the employee is entitled to 'some kind' of pre-termination hearing."  *Id.* (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 546 (1985) (internal citations omitted)).  Lock acknowledges that he received written notice of his pretermination hearing, that he heard the evidence against him, and that, with the assistance of counsel, he had the

opportunity to present his side of the story through his own testimony and through the testimony of witnesses he called.  *See* Lock Dep., 173:3–174:1.  Thus, he does not dispute that he received all of the process required with respect to pretermination hearings under *Loudermill*.  *See McKinney*, 20 F.3d at 1561–62.  Rather, he contends that his pretermination hearing was constitutionally inadequate because the decision was preordained, as a majority of the City Council members had already agreed to terminate him regardless of whatever exonerating evidence he would present at the hearing.  *See* Doc. 43, ¶¶ 37–45; Doc. 95, pp. 21–23.  The City asserts that it is entitled to summary judgment because Lock had an adequate remedy, via a post-termination lawsuit in state court, to correct any procedural deprivations that occurred during a supposedly preordained City Council hearing.  *See* Doc. 69, pp. 21–23.  The Court agrees with the City, again finding *McKinney* to prove fatal to Lock's claim.

In *McKinney*, after the Eleventh Circuit decided that the plaintiff only stated a procedural due process claim, rather than a substantive due process claim, in alleging a pretextual termination from his position as a county building official, *see supra* Part III.B, the court proceeded to address his procedural due process claim.  Addressing the plaintiff's allegations that the county commissioners were biased against him and therefore could not provide him a constitutionally adequate pretermination hearing, the court explained the law for courts to apply when considering allegations of decisionmaker bias:

> [D]ue process is satisfied when the challenger has an opportunity to present his allegations and to demonstrate the alleged bias.  A demonstration that the decisionmaker was biased, however, is not tantamount to a demonstration that there has been a denial of procedural due process.  As we mention above, unlike substantive due process violations, procedural due process violations do not become complete "unless and until the state refuses to provide due process."  *Zinermon*, 494 U.S. at 123, 110 S.Ct. at 983.  More specifically, in the case of an employment termination case, "due process [does not] require the state to provide an impartial decisionmaker at the pre-termination hearing.  The state is obligated only to make available 'the means by which [the employee] can receive redress

for the deprivations.'"  *Schaper v. City of Huntsville*, 813 F.2d 709, 715–16 (5th Cir. 1987) (quoting *Parratt v. Taylor*, 451 U.S. 527, 543, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981)) (footnote omitted).

In *Parratt* (and its progeny, *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)), the Supreme Court held that due process did not require pre-deprivation hearings where the holding of such a hearing would be impracticable, that is, where the deprivation is the result of either a negligent or an intentional deprivation of property.  All that due process requires, the Court said, is a post-deprivation "means of redress for property deprivations satisfy[ing] the requirements of procedural due process."  *Parratt*, 451 U.S. at 537, 101 S.Ct. at 1914; *accord Hudson*, 468 U.S. at 533, 104 S.Ct. at 3204.

The precedent established by *Parratt* is unambiguous:  even if McKinney suffered a procedural *deprivation* at the hands of a biased Board at his termination hearing, he has not suffered a *violation* of his procedural due process rights unless and until the State of Florida refuses to make available a means to remedy the deprivation.  As any bias on the part of the Board was not sanctioned by the state and was the product of the intentional acts of the commissioners, under *Parratt*, only the state's refusal to provide a means to correct any error resulting from the bias would engender a procedural due process violation.

20 F.3d at 1562–63.  Thus, the *McKinney* court made clear that decisionmaker bias at a pretermination hearing resulting in an unauthorized and intentional deprivation of property only gives rise to a procedural due process claim when there is no constitutionally adequate state remedy to address the bias.  *See id.*

Because the plaintiff asserted that the state remedy—review by Florida courts—was constitutionally inadequate, the *McKinney* court proceeded to consider that question.  *Id.* at 1563. First, the court surveyed Florida law and determined that Florida courts had the authority to review employment termination cases and to cure violations of due process by granting the relief sought by the plaintiff—a new hearing conducted by a fair tribunal.  *Id.* (citing Florida cases). Next, the court found that the scope of the Florida courts' review would encompass the plaintiff's claims that he was denied due process by an impartial decisionmaker, because Florida courts had the power to undertake broad reviews of all aspects of the case to determine whether due process was observed.  *Id.* (citing Florida cases).  Finally, the court determined that the

plaintiff's state remedy was adequate because Florida courts had the power to remedy the plaintiff's loss both in terms of damages and equitable relief. *Id.* at 1564. The court reasoned that under *Parratt, supra*, "the state's remedial procedure need not provide all relief available under section 1983; as long as the remedy 'could have fully compensated the [employee] for the property loss he suffered,' the remedy satisfies procedural due process." *Id.* (quoting *Parratt*, 451 U.S. at 544) (internal citations omitted). The court concluded that since Florida's procedures were capable of providing him with all the relief constitutionally warranted, the plaintiff's state remedy satisfied procedural due process and alleviated any deprivation he had suffered in a pretextual hearing before the county commissioners.[16] *Id.*

Like the plaintiff in *McKinney*, Lock asserts that his pretermination hearing was pretextual because the outcome was preordained. Even assuming that Lock is correct in this regard, *McKinney* teaches that because the alleged deprivation was the result of the pretextual— and therefore unauthorized and intentional—acts of the City Council members, he has not suffered a violation of his procedural due process rights "unless and until the State of Florida refuses to make available a means to remedy the deprivation." *Id.* at 1563. Lock cannot make this showing. Indeed, Lock has offered no developments in Florida law which would negate the *McKinney* court's conclusion that Florida courts provide a constitutionally adequate remedy for employment termination cases resulting from a pretextual pretermination hearing. Instead, Lock attempts to distinguish *McKinney*, arguing that his property right was "based on a fixed-term bilateral contract (as opposed to a state-law-created property interest consisting of a unilaterally granted expectancy), which specifically provides a property right to a pre-deprivation hearing,

---

[16] The court noted that the plaintiff's claim was not being dismissed for *failure to exhaust state remedies*. *Id.* at n.20. Rather, the court held that the fact that an adequate state remedy was available meant that the plaintiff *failed to state a claim* for a procedural due process violation under *Parratt* and its progeny. *Id.*

and which provides a 'present entitlement' to gainful employment." Doc. 95, p. 21.  However, the mere fact that the *McKinney* plaintiff's property right was created by the county's policy manual, while Lock's was created by contract, is not a meaningful distinction.  *McKinney* does not recognize any such distinction, and instead applies broadly to *all* state-created property rights, regardless of how they are created.

Lock also argues that the Supreme Court's decisions in *Zinermon v. Burch*, 494 U.S. 113 (1990), and *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189 (2001), limited the reach of *Parratt*, upon which the *McKinney* court relied in holding that only the state's refusal to provide a means to remedy a pretextual pretermination hearing would give rise to a procedural due process claim.  *See* Doc. 95, p. 22.  In *Zinermon*, the Supreme Court held that the plaintiff properly stated a procedural due process claim when he alleged that employees at a Florida state-owned hospital had failed to afford him pre-deprivation safeguards in admitting him to the hospital as a "voluntary" mental patient when he was actually incompetent to give informed consent to his admission.  494 U.S. at 115, 139.  In holding that a post-deprivation state remedy was constitutionally inadequate, the Court explained that *Parratt* was inapplicable because:  (1) the admitted patient's deprivation was predictable; (2) pre-deprivation process was not impossible, and (3) the hospital employees could not claim that their conduct was "unauthorized" by the state.  *Id.* at 135–39.

Lock's reliance on *Zinermon* is misplaced.  In *McKinney*, decided *after* the Supreme Court's decision in *Zinermon*, the Eleventh Circuit found that *Parratt*'s rationale *was* applicable, because any bias by the county commissioners was *not* authorized by the state and was the product of intentional acts of the commissioners.  20 F.3d at 1563.  Similarly here, any bias by

the City Council members was unauthorized by the state and was the result of their intentional acts.  Therefore, *Zinermon* is inapposite and *McKinney* is controlling.

In the other case relied upon by Lock, *Lujan*, the Supreme Court addressed the constitutionality of a California statutory scheme which authorized the state to withhold payments due to a contractor on a public works project if a subcontractor on the project failed to pay its workers a prevailing wage.  532 U.S. at 191.  The statutory scheme permitted the contractor, in turn, to withhold similar sums from the subcontractor.  *Id*.  The plaintiff, a subcontractor which had been denied payment by a contractor after a California labor agency determined that the subcontractor failed to pay the prevailing wage, asserted that the statutory scheme violated its procedural due process rights because the scheme did not afford the subcontractor a hearing before or after the withholding of payment.  *Id.* at 193.  In upholding the constitutionality of the statutory scheme, the Supreme Court concluded that the plaintiff had an adequate remedy via a post-deprivation lawsuit in state court.  *Id.* at 195–99.  In reaching its decision, however, the *Lujan* Court distinguished the case from its prior decisions requiring a prompt pre- or post-deprivation hearing, explaining that "in each of those cases, the claimant was denied a right by virtue of which he was presently entitled either to exercise ownership dominion over real or personal property, or to pursue a gainful occupation."  *Id.* at 196.

Lock interprets *Lujan* as requiring a constitutionally adequate (i.e., unbiased) pretermination hearing when an individual has a "present entitlement" to a continuing benefit, such as the right to pursue gainful employment.  *See* Doc. 95, p. 22.  However, in each of the cases distinguished by the *Lujan* Court as requiring a prompt pre- or post-deprivation hearing, the issue was the *timeliness* of the hearing under the Due Process Clause, not whether the claimant had an adequate post-deprivation remedy in state court.  *See United States v. James*

*Daniel Good Real Prop.*, 510 U.S. 43 (1993); *FDIC v. Mallen*, 486 U.S. 230 (1988); *Barry v. Barchi*, 443 U.S. 55 (1979).  In this case, the dispute is not whether Lock received a timely hearing, but instead whether a post-deprivation suit in state court would be a constitutionally adequate remedy for any bias on the part of the City Council members during the pretermination hearing.  After *Lujan*, the Eleventh Circuit has continued to rely upon *Parratt* and *McKinney* in affirming that "when a deprivation of property is random and unauthorized, [a]ll that due process requires . . . is a post-deprivation means of redress for property deprivations satisfy[ing] the requirements of procedural due process.  The doctrine extends to both negligent and intentional deprivations by state officials."  *Pacesetter Apparel, Inc. v. Cobb County, Ga.*, 374 F. App'x 910, 912 (11th Cir. 2010) (internal citations and quotations omitted); *see also Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Georgia*, 633 F.3d 1297, 1317 (11th Cir. 2011); *Autery v. Davis*, 355 F. App'x 253, 255 (11th Cir. 2009) ("In this circuit, state-court review of employment termination decisions qualifies as an adequate post-deprivation remedy.").  Therefore, Lock's reliance on *Lujan* is not persuasive.

In sum, Lock has not shown that the State of Florida refuses to provide him with a constitutionally adequate remedy to correct any unauthorized and intentional deprivation resulting from his pretermination hearing.  To the contrary, Lock has a constitutionally adequate remedy via a post-deprivation lawsuit in the Florida court system.  *See McKinney*, 20 F.3d at 1564.  Therefore, he has failed to state a procedural due process claim, *see id.* at 1564 n.20, and the City is entitled to summary judgment.

**D.      Lock's State Law Claims Against the City and the Individual Defendants**

Having dismissed the only grounds for federal subject matter jurisdiction, the Court declines to continue to exercise supplemental jurisdiction over Lock's state law claims against the City and the Individual Defendants.  The Eleventh Circuit has made clear that "once a court

decides that it has power to exercise supplemental jurisdiction under [28 U.S.C.] § 1367(a), then the court should exercise that jurisdiction, unless § 1367(b) or (c) applies to limit the exercise." *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1352 (11th Cir. 1997).   Here, § 1367(c) applies because the Court "has dismissed all claims over which it has original jurisdiction."   28 U.S.C. § 1367(c)(3).   "Where § 1367(c) applies, considerations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise supplemental jurisdiction."   *Baggett*, 117 F.3d at 1353.   The Supreme Court has advised that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."   *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988).

It is preferable for Florida's state courts to make determinations of Florida law, particularly when considering the absolute immunity issues raised by the Individual Defendants and the fact that the federal law claims have been dismissed prior to trial.   *See Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1288 (11th Cir. 2002) ("Both comity and economy are served when issues of state law are resolved by state courts.   The argument for dismissing the state law claims in order to allow state courts to resolve issues of state law is even stronger when the federal law claims have been dismissed prior to trial."); *Baggett*, 117 F.3d at 1353.   Moreover, Lock will be able to timely file his state law claims in state court.   *See Pompano Helicopters, Inc. v. Westwood One, Inc.*, No. 07-61737-CIV, 2008 WL 906749, at *1 (S.D. Fla. Apr. 3, 2008) (noting that Florida's statute of limitations for a claim of tortious interference with a contract is four years); *Watkis v. Am. Nat'l Ins. Co.*, 967 F. Supp. 1272, 1275 (M.D. Fla. 1997) (noting that Florida's statute of limitations for a claim of intentional infliction of emotional distress is four

years); *Med. Jet, S.A. v. Signature Flight Support-Palm Beach, Inc.*, 941 So. 2d 576, 577 (4th Fla. Dist. Ct. App. 2006) (noting that Florida's statute of limitations for a claim of breach of a written contract is five years).  Therefore, the Court sees no reason to depart from the general rule that the Court should decline to continue to exercise supplemental jurisdiction.  *See, e.g.*, *Ingram v. Sch. Bd. of Miami-Dade County*, 167 F. App'x 107, 109 (11th Cir. 2006) (holding that the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over the plaintiff's state law claims after granting summary judgment on the federal law claims where the court addressed the statute of limitations and weighed the considerations of judicial economy, convenience, fairness, and comity).  Accordingly, Lock's state law claims will be dismissed without prejudice.

## IV.    CONCLUSION

For the aforementioned reasons, the Court will grant the City's Motion for Summary Judgment as to Counts I, II, and III of the Second Amended Complaint, as no genuine issues of material fact exist and there is an absence of evidence to support those federal law claims.  The City is entitled to judgment in its favor as a matter of law on those claims.  The Court will deny the remainder of the City's Motion for Summary Judgment, and the entirety of the Individual Defendants' Motions for Summary Judgment, without prejudice, because the Court declines to exercise supplemental jurisdiction over Lock's state law claims.

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1.    The City's Motion for Summary Judgment (Doc. 69) is **GRANTED in part** and **DENIED in part**:

a.    As no genuine issues of material fact exist, the City's Motion for Summary Judgment is **GRANTED** as to Counts I, II, and III of the Second Amended Complaint.

b.     In all other respects, the City's Motion for Summary Judgment is **DENIED without prejudice**.

2.     Stephany Eley's Motion for Summary Judgment (Doc. 66) is **DENIED without prejudice**.

3.     Michael Hazlett's Motion for Summary Judgment (Doc. 67) is **DENIED without prejudice**.

4.     Hal Rose's Motion for Summary Judgment (Doc. 68) is **DENIED without prejudice**.

5.     The Clerk is directed to terminate any pending motions and deadlines as moot, enter judgment in favor of the City **only** as to Counts I, II, and III of the Second Amended Complaint, and **close** this case.

**DONE** and **ORDERED** in Orlando, Florida on December 23, 2013.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties

33