# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**BRIAN LOCK,**

**Plaintiff,**

**v.**                                                   **Case No:  6:12-cv-680-Orl-36TBS**

**CITY OF WEST MELBOURNE, FLORIDA,
STEPHANY ELEY, MICHAEL HAZLETT,
and HAL ROSE,**

**Defendants.**

_____

## <u>ORDER</u>

This cause comes before the Court on four renewed motions for summary judgment on Plaintiff Brian Lock's ("Lock") Second Amended Complaint: (1) Defendant Stephany Eley's ("Eley") Renewed Motion for Summary Judgment (Doc. 172); (2) Defendant Michael Hazlett's ("Hazlett") Renewed Motion for Summary Judgment (Doc. 173); (3) Defendant Hal Rose's ("Rose") Renewed Motion for Summary Judgment (Doc. 174); and (4) Defendant City of West Melbourne's ("City") Amended Renewed Motion for Summary Judgment (Doc. 179).[1] Lock filed a response in opposition to the Individual Defendants' motions (Doc. 175) and a response in opposition to the City's motion (Doc. 180).   Upon due consideration of the parties' submissions, including deposition transcripts, affidavits, memoranda of counsel and accompanying exhibits, and for the reasons that follow, the motions are granted-in-part and denied-in-part.

---

[1] Eley, Hazlett, and Rose are collectively referred to as the "Individual Defendants" and, together with the City, the "Defendants."

I.      **BACKGROUND**

A.      **Statement of Facts**[2]

1.      *Introduction*

This action arises from Lock's termination from his position as Chief of the City's Police Department by a 5-2 vote of the City Council on May 3, 2012.  JSF, ¶¶ 1, 22; JPS, p. 23.  Lock had been employed by the City since December 30, 1980, and had served as Chief of Police since January 6, 1990.  JPS, p. 23.  At the time of his termination, Lock also served as a commissioner on the Criminal Justice Standards and Training Commission ("CJSTC"), a unit of the Florida Department of Law Enforcement ("FDLE") that is responsible for overseeing investigations and discipline arising from law enforcement officer misconduct, and for determining final disciplinary action against officers.  JSF, ¶ 18; Docs. 66-1, 66-2, Deposition of Brian Lock ("Lock Dep."), 21:18–22:20.  At all relevant times, Defendants Eley and Hazlett served as council members on the City Council, while Defendant Rose served as the City's mayor and, as such, was a voting member on the City Council.  JPS, p. 23; Doc. 69-4, Affidavit of Hal Rose ("Rose Aff."), ¶ 2.  Eley, Hazlett, and Rose each voted in favor of Lock's termination.  *See* Rose Aff., ¶ 3; Doc. 69-5, Affidavit of Stephany Eley ("Eley Aff."), ¶ 3; Doc. 69-6, Affidavit of Michael Hazlett ("Hazlett Aff."), ¶ 3.

Lock's employment agreement with the City provided that Lock could only be terminated "for cause" upon "a majority (4) vote of the [City] Council at a properly noticed meeting wherein

---

[2] This Statement of Facts is derived primarily from the parties' Joint Stipulation of Undisputed Facts ("JSF") (Doc. 106), the Joint Final Pretrial Statement ("JPS") (Doc. 127), the deposition testimony and affidavits of various individuals, and accompanying exhibits.  The testimony of the parties differs with respect to the events leading up to Lock's termination.  At this stage, the Court is obliged to construe the facts in the light most favorable to Lock.  *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).

Lock shall be afforded a hearing."[3]  Doc. 43-1, p. 8.  The Defendants maintain that Lock's termination was the result of his failure to properly investigate and report a theft of prescription drugs by his subordinate, Charles Schrum ("Schrum"), and Lock's alleged efforts to obtain a pension for Schrum after the theft.  *See* Docs. 66–69.  The Defendants believe that Lock's actions and inactions were part of a deliberate effort by him, due to their friendship, to cover up Schrum's theft and ensure that Schrum received a pension.  *See id.*  Lock, on the other hand, claims that the actual reason he was terminated was because of his refusal to fire another subordinate, James Michael Helms ("Helms"), who was a political rival of Hazlett, Eley, and Rose, as well as Lock's perceived political alignment against the trio.  *See* Docs. 95, 99.

Under the City's Charter, the City Council has the sole authority to terminate individuals it appoints to office, such as the Chief of Police.  *See* West Melbourne, Fla., Charter art. III, § 1(b) & art. XI, § 1, *available at* http://library.municode.com/index.aspx?clientId=11693.  However, the authority to hire and fire all other City employees lies exclusively with the City Manager.  *See id.*, art. V, § 4(a).  The City's Charter further provides: "Except for the purpose of inquiries and investigations, the city council and its members shall deal with the city officers and employees who are subject to the direction and supervision of the city manager solely through the city manager, and neither the city council nor its members shall give orders to any such officer or employee, either publicly or privately."  *Id.*, art. III, § 8(b).  Under City policies, department heads, such as the Chief of Police, may make recommendations to the City Manager regarding whether

---

[3] Before April 6, 2010, Lock had been performing under an employment agreement with the City that permitted the City to terminate him at will.  *See* Doc. 43-1, pp. 1–5.  However, on that date, Lock entered into the new employment agreement with the City which provided that he could only be terminated "for cause."  *See id.* at 6–8.

to hire or fire a City employee, but the City Manager retains ultimate authority in making the decision.  Doc. 78, Deposition of Scott Morgan ("Morgan Dep. I"), 7:13–8:9.

City policies prohibit the City from terminating an employee due to his support of any political candidate for office.  *Id.* at 69:20–22.  City policies also provide that "[e]very employee has the right to express his or her views as a citizen and to cast a vote.  Coercion of or by an employee for political purposes and using the position of employment for political purposes is prohibited."  Doc. 99-4.

> ### 2.   *The Schrum Incident*

In January 2005, Schrum, a lieutenant in the City Police Department, was involved in a one-car accident while driving a City-owned police vehicle.  JSF, ¶ 4.  After Schrum admitted to Lock that he had used a prescription pain killer before the accident, Lock recommended to the City Manager at the time, Mark Ryan ("Ryan"), that Schrum be demoted from lieutenant to sergeant.  *Id.* at ¶ 5; *see* Doc. 69-1, p. 4.  Ryan ultimately decided not to demote Schrum, but he did impose an unpaid ten-day suspension.[4]  JSF, ¶ 6.

Over four years later, on June 18, 2009, Helms, the Director of Support Services for the City's Police Department, was conducting a routine review of feeds from the surveillance cameras located throughout the Police Department building, when he noticed that one of the cameras in the evidence room had been pushed upward from its usual position.  *Id.* at ¶ 3; Doc. 66-3, Deposition of James Michael Helms ("Helms Dep."), 23:3–14.  Upon reviewing the previous day's recordings by that camera, Helms observed Schrum enter the evidence room, push the camera upward, and then put something that had been stored in the room in his pocket.  Helms Dep., 23:14–24.  Helms

---

[4] Ryan also ordered Schrum to reimburse the City for the insurance deductible resulting from the accident, directed him to enroll in the City's Employee Assistance Program, and placed him on probationary status for one year.  JSF, ¶ 6.

immediately notified Michael Czernik ("Czernik"), the Assistant Chief of Police, who, upon viewing the recordings, told Helms to make copies. *Id.* at 23:25–24:5; JSF, ¶ 2.

The next morning, Czernik and another officer re-positioned the camera to its original position. Helms Dep., 24:5–9. Later that day, while Czernik and Helms were watching the live camera feed during the lunch break, they observed Schrum enter the evidence room with a cart, place a number of bags on the cart, and then exit the room with the cart. *Id.* at 26:18–28:14. Czernik then approached Schrum in the hallway and instructed him to put the bags back in the evidence room and not to go back into the room until further notice. *Id.* at 28:15–23. Czernik made a phone call to Lock, who was in his car, and told him that Schrum had been observed repositioning the evidence room surveillance camera in a suspicious manner. JSF, ¶ 7. Lock told Czernik to change the locks to the evidence room and that Czernik should hold the only key. *Id.*; Lock Dep., 101:25–102:11.

Later that day, Helms called Lock and told him that Helms was with an employee who was in trouble and needed help. JSF, ¶ 8. Lock agreed to meet Helms and the troubled employee in the parking lot of a local coffee shop. *Id.* Upon his arrival, Lock observed Schrum in Helms' car in an extremely emotional state. *Id.* Schrum told Lock that he had a drug problem and needed help. *Id.* at ¶ 9. Helms and Lock drove Schrum to a drug treatment facility, where Schrum was admitted. *Id.* at ¶ 10. Immediately before entering the facility, Schrum admitted to Lock that he had taken narcotic drugs from the evidence room. *Id.* at ¶ 11.

Four days later, on June 23, 2009, Schrum sent Lock a memorandum announcing his decision to request a medical/disability retirement, citing "knee[], back, and other problems." *Id.* at ¶ 13; *see* Doc. 69-1, p. 8. That same day, Lock provided Schrum with written notice that Schrum's law enforcement authority had been removed. JSF, ¶ 13; *see* Doc. 69-1, p. 9. Shortly

thereafter, Schrum was admitted to a long-term, out-of-state treatment facility.  Lock Dep., 99:8–10.  After his admission to the initial drug treatment facility, Schrum never returned to duty, and remained on unpaid leave from his work with the City until his employment ended.  *Id.* at ¶ 12.

After learning that Schrum had taken narcotic drugs from the evidence room, Lock informed the State Attorney, Norm Wolfinger ("Wolfinger"), in July 2009.  Lock Dep., 117:10–17.  Wolfinger expressed concern that Schrum's confession to Lock may be inadmissible in any criminal proceeding against Schrum under *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967).[5]  Lock Dep., 167:11–20.  Wolfinger told Lock to have Czernik prepare an informational report and send it to the Chief Assistant State Attorney, Wayne Holmes ("Holmes").  *Id.* at 109:17–110:1.  Pursuant to Wolfinger's instructions, Lock ordered Czernik to begin a criminal investigation of Schrum's conduct.  Lock Dep., 98:20–100:16.  Lock did not order an internal affairs investigation separate from the criminal investigation, even though he understood that he had a duty to perform an internal affairs investigation pursuant to the Florida Administrative Code.[6]  *Id.* at 105:25–106:6, 130:9–18.  As part of the criminal investigation, Lock ordered Czernik to perform an audit of the evidence room, and to review the surveillance footage and save any suspicious videos for future evidentiary use.  *Id.* at 100:14–101:4, 106:16–107:1.  The audit revealed that two pill bottles in the

---

[5] *Garrity* held that coerced statements obtained from a police officer under threat of removal from office cannot be used in subsequent criminal proceedings against the officer.  385 U.S. at 493.

[6] Subsection 11B-27.003 of the Florida Administrative Code requires a law enforcement agency to conduct an investigation when it has cause to suspect that an officer has, among other things, failed to maintain good moral character as defined under subsection 11B-27.0011(4), which includes the perpetration of a felony, regardless of whether the officer has been criminally prosecuted.  *See* Fla. Admin. Code Ann. r. 11B-27.003(1), 11B-27.0011(4)(a).  If the agency concludes that there has been a violation of those provisions, it must send to the CJSTC a completed Internal Investigation Report form CJSTC-78 ("Form CJSTC 78") within 45 days of reaching its conclusion, regardless of whether any criminal action is pending or contemplated.  *See* Fla. Admin. Code Ann. r. 11B-27.003(2).

evidence room did not contain the same number of pills that the officer submitting the bottles had indicated in his initial report. *Id.* at 107:4–16. Those pill bottles were in the evidence room after being seized following an unattended death, rather than during a criminal investigation.[7] *Id.* at 112:23–113:16; Doc. 73, Deposition of Wayne Holmes ("Holmes Dep."), 18:2–6.

On September 16, 2009, Lock sent a Confidential Information Report to Holmes reporting Schrum's admitted theft of narcotic drugs from the evidence room. JSF, ¶ 15; *see* Doc. 69-1, pp. 19–21. The Confidential Information Report had Lock's signature and contained a handwritten note on the last page stating: "WAYNE – NORM HAD MENTIONED SOME CONCERN ABOUT GARRITY . . . . THANKS, BRIAN". *See* Doc. 69-1, p. 21. Lock testified that the purpose of this note was to inform Holmes that Wolfinger had already expressed concern about the admissibility of Schrum's confession under *Garrity*. Lock Dep., 167:5–20. The following day, Holmes had a phone conversation with Lock, Czernik, and Helms. Holmes Dep., 16:21–17:1. Holmes expressed concern about the *Garrity* issue, and also stated that there was a *corpus delicti* issue because prosecutors would be unable to prove that any missing pills had not simply been flushed down the toilet pursuant to the City Police Department's practice. *Id.* at 16:21–17:10, 18:1–20:15. However, Holmes could not conclusively say that the State Attorney's Office would be unable to pursue criminal charges against Schrum. *Id.* at 17:1–4. Holmes believed that he needed further evidence, so he asked for sworn statements from Czernik and Helms, video recordings of Schrum's removal of items from the evidence room, and a written inventory identifying the particular items of evidence that were missing. *Id.* at 17:11–25, 21:9–13, 21:19–

---

[7] After the death of an individual who was in hospice care or otherwise unattended by a physician, City police officers would gather the medications from the site of the death and store them in the evidence room for ultimate disposal, rather than for any criminal investigation. Holmes Dep., 18:2–11. The practice of the City Police Department was to flush those medications down the toilet when the evidence room became too crowded. *Id.* at 18:11–16.

24.  Approximately one month after his request, Holmes had not received the items he requested, so he spoke with Lock, who assured Holmes that the items would be sent.  *Id.* at 33:11–21.  Several months later, Holmes still had not received the items he requested, so he placed the Confidential Information Report in a storage file on January 28, 2010.  *Id.* at 15:10–16:18, 21:14–22:1, 32:11–33:7.  To date, Holmes has not received the items he requested.  *Id.* at 32:20–33:7.

Approximately one week after Schrum's admission to the drug treatment facility, while the criminal investigation was ongoing, Schrum sent Lock an email inquiring about his eligibility for a pension.  Lock Dep., 112:14–20.  On August 20, 2009, Lock sent Schrum a letter stating that Schrum's position was being eliminated, effective September 30, 2009, as a result of budget cuts.[8]  JSF, ¶ 14; *see* Doc. 69-1, p. 10.  Lock wrote: "This action is permanent and the position will not be funded in our 2009-2010 budget; therefore, it is imperative that you expedite the necessary paperwork for the retirement options for the Police Pension Board since you will not be returning to employment with the Police Department."  Doc. 69-1, p. 10.  On September 17, 2009, Lock sent Schrum a letter stating: "Regarding your application for disability pension, I recommend that you consult with your primary orthopedic physician and possibly provide him with a job description for Police Commander so that he can render a written opinion as to whether you can perform the duties required.  This may assist the Pension Board in its decision."  *Id.* at 11.  Lock enclosed job descriptions and a sample letter from a physician.  *See id.*

Schrum's disability pension application was eventually approved by the City's Police Pension Board (the "Pension Board") on February 3, 2010.  JSF, ¶ 16; *see* Doc. 69-1, pp. 13–18.  Lock testified that he did not inform the City Council, the City Manager, or the City Attorney

---

[8] Lock testified that City officials were also considering eliminating two other law enforcement positions.  Lock Dep., 99:19–100:4.

about the Schrum incident because Bonni Jensen ("Jensen"), an attorney for the Pension Board, told him that the City could withhold Schrum's pension only upon a felony conviction, and Lock believed that a felony conviction was unlikely under the circumstances.  Lock Dep., 132:6–135:15, 136:13–20, 138:23–139:20, 142:11–19.  Jensen, however, testified that Lock never told her exactly why Schrum was being investigated and that, under a provision of the City Code, if a law enforcement officer is terminated for admitted theft from the City, the officer's pension is forfeited, regardless of whether the officer has been convicted.  Doc. 74, Deposition of Bonni Jensen, 14:11–22, 23:2–22; *see* West Melbourne, Fla., Code of Ordinances § 34-93(a)(2), *available at* http://library.municode.com/index.aspx?clientId=11693.

### 3.   Lock's Refusal to Fire Helms and His Perceived Political Alignment Against Hazlett, Eley, and Rose

In September 2010, Helms made a $100 cash campaign donation to Rose's political opponent, William Mettrick ("Mettrick"), for the upcoming mayoral election.  Helms Dep., 65:16–66:5; Doc. 77, Deposition of William Mettrick ("Mettrick Dep."), 10:13–24.  Even though Rose, the incumbent, would defeat Mettrick in the election, Rose, Hazlett, and Eley criticized the donation as improper, believing that Helms was attempting to assert influence based on his position in the Police Department.  Doc. 70, Deposition of Stephany Eley ("Eley Dep."), 35:15–38:5; Mettrick Dep., 5:12–25, 13:15–14:14; Helms Dep., 65:16–66:12, 69:9–11; Doc. 96, Affidavit of Terri Leigh Jones ("Jones Aff."), ¶ 10.  According to Eley, the donation was brought up at City Council meetings "more than once."  Eley Dep., 35:15–25.[9]  Rose eventually met with Lock and

---

[9] Eley and Hazlett also encouraged a local businesswoman to file a complaint with the Florida Elections Commission ("FEC") on the grounds that the donation violated rules prohibiting campaign donations of more than $50 in cash.  Mettrick Dep., 10:22–17:2.  Mettrick eventually settled the matter with the FEC for a small fine.  *Id.* at 16:4–10.

"strongly expressed" that he was unhappy with the donation and the fact that Lock had not taken action against Helms.  Lock Dep., 218:12–20.

The following year, Mettrick, John D'Amico ("D'Amico"), Andrew Jones ("Andrew Jones"), Andrea Young ("Young"), John Tice ("Tice"), and Deborah Raskett ran for the three open positions on the City Council held by incumbents D'Amico, Andrew Jones, and Young.  Jones Aff., ¶ 18; Mettrick Dep., 5:6–8.  Hazlett, Eley, and Rose, whose City Council positions were not up for election that year, supported Tice.  Doc. 71, Deposition of Michael J. Hazlett ("Hazlett Dep."), 95:23–96:7; Jones Aff., ¶ 22.  In July 2011, a few months before the election, the West Melbourne Citizens Police Academy Alumni Association ("Police Alumni Association"), a City-funded non-profit organization of which Mettrick was the president and Helms was the Police Department liaison, published a brochure to promote awareness about the organization's support of the Police Department.  Mettrick Dep., 18:16–19:14.  The brochure, which was distributed to the City Council members and current and former Police Department officers, included photographs of Mettrick and Helms.  *Id.* at 19:2–23.  Hazlett and Eley construed the brochure as an attempt by the Police Department to officially endorse Mettrick, even though the brochure did not specifically mention Mettrick's candidacy.  Eley Dep., 43:4–44:20.  On July 27, 2011, Hazlett sent an email to Lock which denounced the brochure as a political tactic to promote "the beginning of the Bill Mettrick upcoming November election season."  Doc. 99-1, p. 1.  In the email, Hazlett stated that he would be forwarding the brochure to the Brevard County Supervisor of Elections and the "Election Ethics folks in Tallahassee" for investigation.  *Id.*  In a series of follow-up emails, Hazlett stated his intention to place the City's funding of the Police Alumni Association on the City Council's next meeting agenda, because he believed that the organization was "organized for one reason and one reason only – the election of a political candidate for the office of City Council

and that focus is on one single candidate, Mr. Bill Mettrick." *See id.* at 2–5.  At its August 16, 2011 meeting, on a motion raised by Hazlett and seconded by Eley, the City Council voted 5-2 to discontinue the City's funding of the Police Alumni Association, with Rose, Hazlett, and Eley voting in the majority. *See id.* at 6, 14–16.

After the City Council vote, Hazlett continued to express concern over Helms.  On August 29, 2011, Hazlett sent Lock an email that stated, in pertinent part:

> Mr. Helms, in my view, has been able to run rogue politically in our city for far to [sic] long and put his time & efforts in area's [sic] he has no business asserting himself. . . .  I now see his 'cheer-leading' as that of a corrupt, union-thug pushing a very specific agenda and clearly leaving the balance of the city to fall to the chopping block as long as his agenda, and that of the Police department he represents, is addressed. . . .  I believe my position on this management employee is very clear at this point and hope you further consider the opinions of those outside the [Police Department] looking at this specific issue, especially the folks elected to lead our city.

*Id.* at 18.  In the email, Hazlett requested that Lock break down the Police Department's budget and list the individual salaries of all six members of the Police Department's executive team, including Helms, instead of listing their combined salaries under an "Executive Wages" heading. *See id.* at 19.  Lock provided the breakdown requested by Hazlett, but expressed concern over the personal nature of the comments that Hazlett made toward Helms. *See id.* at 20–21.  In response, Hazlett sent an email to Lock criticizing him for "defend[ing]" Helms. *Id.* at 20.  The email further stated:

> Your continued endorsement, whether private or public, of those candidates that will give your department 'whatever' it requests may have worked in the past – but as it's been said over and over lately in local government, "Its [sic] a new normal and the dollars that once flowed freely exist now under very tight public scrutiny". May I also remind you sir to take another look at the Charter of this city, especially the section pertaining to the elected leadership, as the chartered officers are accountable to a City Council & a Mayor.  Lets [sic] stop dancing around the reality as it now exists – I once considered us friends Brian, but now realize *that* friendship was only consistent when the [Police Department] was getting what it wanted. . . . Naturally I can only speak for myself when I say this but the days of the Police

11

department being the 'big pig' in the line at the local buffet and leaving very little for the others in that same line are quickly coming to an end.

*Id.*

On September 19, 2011, Hazlett and Rose received an email[10] from a "Ryan Cunningham," written in the form of an allegory, which blamed the Police Department's allegorical woes on Helms, and which urged Lock: "rid yourself and your kingdom of the poison that Helms brings." *See id.* at 22–23.  The next day, while discussing the City's 2011-2012 fiscal year budget at a City Council meeting, Eley made a motion, seconded by Hazlett, to modify the proposed budget by de-funding Helms' position.  Doc. 95, pp. 29–32.  After several citizens spoke out against de-funding Helms' position and criticized the personal comments made by Hazlett toward Helms, the motion was tabled by a 4-3 vote, with Rose, Eley, and Hazlett in the minority.  *Id.* at 30–33.  The City Council eventually passed a budget retaining Helms' position by a 4-3 vote, again with Rose, Eley, and Hazlett in the minority.  *Id.* at 36.  Lock avers that during a break in the proceedings, Eley approached him and told him that if Lock did not fire Helms, she would "get rid of" Lock.  *See* Lock Dep., 186:25–188:4; Jones Aff. ¶ 26.  Shortly after the conclusion of the meeting, Hazlett sent Lock an email accusing him of "bring[ing] in a bunch of pure union thugs from New York" to obtain budget concessions for the police officers' union.  Doc. 99-1, p. 24.

In a series of emails after the budget vote, Hazlett continued to criticize Lock for attempting to form a police officers' union.  Hazlett also continued to accuse Lock and Helms of supporting Mettrick and D'Amico in the upcoming election.  On September 30, 2011, Hazlett sent group emails to his friends criticizing D'Amico for representing himself as a Republican when D'Amico had previously served as a Democrat in the Rhode Island state senate.  *See id.* at 26–29.  In one of

---

[10] The email was made publicly available by Hazlett, allegedly because it was sent on the City's server.  *See* Doc. 99-1, p. 22.

the emails, Hazlett accused D'Amico of "using" Lock to get re-elected, and stated that "Chief Lock will live to regret the day he packed our house with unwanted union thugs to rudely shout down our democracy with there [sic] entitlement attitudes & terrible profanity." *Id.* at 27. Hazlett also wrote: "To Mike Helms – make sure your team and 2 candidates get a copy of this email . . . I have only just begun to alert the voters in West Melbourne." *Id.* at 28. On October 23, 2011, Hazlett wrote an email directed toward D'Amico, stating: "[t]he City Council saw right through your corrupt little scam organization, sadly using our Police Dept. and many good folks who wanted a 'real' alumni [organization], to get your buddy, Bill Mettrick, elected." *Id.* at 30. On October 31, 2011, after being pulled over by West Melbourne police officers in a traffic stop, Hazlett wrote an email to Lock and other City officials, accusing Lock of orchestrating the traffic stop because Hazlett had opposed the budget concessions. *See id.* at 34–35. In the email, Hazlett stated: "I no longer trust our Police Chief at all. I believe he now has taken the strategy, with his political pal Helms, to simply harass me and use his badge to run me off . . . ." *Id.* at 34.

In the November 2011 election, Mettrick and Tice were elected, and Young was reelected, to the City Council, while D'Amico lost his bid for reelection. Jones Aff., ¶ 23. As a result of the election, Hazlett, Eley, Rose, and Tice obtained a ruling majority on the City Council. *Id.* at ¶ 24. Soon after the election, Terri Leigh Jones ("Jones"), a former Interim City Attorney for the City and a friend of both Hazlett and Lock, received a phone call from Hazlett, who told her that he had heard a rumor that Lock had an affair with a sexual assault victim, and that he was going to "get details." *Id.* at ¶¶ 2–3, 28. After Lock denied the rumor to Jones, Jones relayed the denial to Hazlett. *Id.* at ¶ 31. Jones avers that Hazlett told her if Lock would just follow Hazlett's instructions to fire Helms, Lock would be "okay." *Id.* at ¶ 32. Hazlett also told Jones that Lock needed to do something about Helms or it would "not be a good result for Lock." *Id.* at ¶ 25.

According to Jones, Hazlett said that he told Lock it would be better for Lock and the Police Department's budget if Helms were fired.  *Id.* at ¶ 32.  Jones claims that after she told Hazlett that Lock could not fire Helms because of his political affiliations, Hazlett said that he did not care because "his group had won the election and that is all that should matter."  *Id.*

### 4.   The Anonymous Letter and Lock's Termination

In November 2011, after the election, Hazlett received an anonymous letter in the mail urging him to continue to place pressure on the Police Department and to fire Lock and Helms. Hazlett Dep., 66:9–67:5; *see* Doc. 99-1, pp. 36–37.  The letter stated:  "Check on how many times Damico [sic] and Mettrick are at the police department or how many times they call the Chief daily."  Doc. 99-1, p. 36.  The letter also raised the Schrum incident, which to that point in time had not been brought before the City Council members, and encouraged Hazlett to investigate the matter.  *Id.*  The letter implied that Lock had covered up Schrum's theft because they were friends, and that Lock helped Schrum secure a pension: "How about the best friend of Lock, a Commander that <u>stole drugs</u> from the police evidence room, a criminal act, but Locks [sic] absolute control over the three police officers on the police pension board (they didn't like it), the Commander and his drug problem now receives a very sweet retirement thanks to Lock and at the expense of the city taxpayers dollar.  He should be in jail not get a pension, but Lock had it taken care of. . . ." *Id.*

After receiving the anonymous letter, Hazlett forwarded copies of the letter to City Manager Scott Morgan ("City Manager Morgan") and City Attorney Jim Wilson ("City Attorney Wilson") on November 14, 2011.  *See* Doc. 69-2, pp. 8, 27–29.  Hazlett also sent copies of the letter to the City Council members.  Eley Dep., 77:10–20.  On November 15, 2011, City Manager Morgan questioned Lock about the allegations in the letter.  *See* Doc. 69-2, p. 8; Lock Dep.,

120:16–19.  That same day, Lock provided the FDLE with a completed Form CJSTC 78[11]

regarding the Schrum incident.  *See id.* at 8, 30.  The completed Form CJSTC 78 indicated that

Schrum had perpetrated a felony by removing prescription drugs from the evidence room without

permission, and that an agency investigation concluded that Schrum's actions were a violation of

agency regulations requiring officers to maintain good moral character.  *See id.* at 30.  Also that

day, Schrum submitted an affidavit to the FDLE relinquishing his certification as a police officer.

*See* 69-1, pp. 22–23.

On November 17, 2011, Lock briefed the City Council members on the Schrum incident.

*See* Doc. 69-2, p. 8.  On November 18, 2011 and November 19, 2011, Hazlett sent emails to Rose,

City Manager Morgan, and City Attorney Wilson criticizing Lock for failing to turn over evidence

related to the Schrum incident and accusing Lock of attempting a cover-up.  Doc. 99-1, pp. 38–39.

Hazlett and Eley were quoted in local media reports calling for Lock to resign.  *See id.* at 51–55;

Hazlett Dep., 71:4–13, 74:13–19.  Schrum avers that Tice met with him and told him that "none

of this would have been necessary if [Lock] had fired Helms."  Doc. 96, pp. 35–36, Affidavit of

Charles Schrum ("Schrum Aff."), ¶¶ 2, 4.

On December 5, 2011, a special meeting of the City Council was held to determine whether

Lock should be placed on administrative leave.  *See* Doc. 99-1, pp. 40–47.  The City Council voted

5-2 *not* to place Lock on administrative leave, with Hazlett and Tice voting in the minority.  *Id.* at

47.  In the same vote, the City Council agreed to hire an outside agency to conduct an investigation

into the Schrum matter and to hire legal counsel to review the investigation.  *Id.*  At the conclusion

of that meeting, Lock alleges that Hazlett posted the following excerpt to Hazlett's Facebook page:

> The corrupt in law enforcement, lead [sic] by Chief Brian Lock, in the city of West
> Melbourne had there [sic] circus night totally avoiding the FELONY cover-up at

---

[11] *See supra* n.6.

hand and enjoyed shooting the messenger.  WHY IS IT SO HARD FOR PEOPLE TO TELL THE TRUTH ANYMORE IN OUR SOCIETY? Very sad series of events for the honest taxpayers of this city as the corrupt & evil continued the lies and deception.  The 'good christi…an [sic] & former Marine, Councilman Pat Bentley, helped the Chief cover up his crimes.  Mayor Hal Rose & Deputy Mayor Stephany Eley ABSOLUTELY, 100% PLAYED THE POLITICAL RE-ELECTION GAME WELL, and sold out the very folks they swore to protect not wanting to upset the 'good' Police Chief……very sad for the honest, hard working folks that pay the bills in West Melbourne. The taxpayer of our fine city was robbed tonight by corrupt law enforcement and those elected officials looking to cover-up an already outrageous crime. I will soon depart this corrupt, cesspool of very dirty politics and begin a new life in my beautiful Smoky Mountains at Hazlett Haven . . . can't wait to breath [sic] some fresh, clean air once again and get away from the phonies who claim to be my friend and 'have my back' . . . yea right!  Tonight is a classic example of EXACTLY WHY folks want NOTHING to do with politics on any level in this great country.  Being n effective leader takes COURAGE & CONVICTION and sadly thats [sic] just to [sic] high a price to pay anymore for most, certainly not for Coach John tice……a true winner in life & new friend!

Doc. 99-2, Affidavit of Brian Lock ("Lock Aff."), ¶ 2 & Exh. 1.  On January 24, 2012, Hazlett sent City Attorney Wilson an email criticizing him for "playing both sides of this issue" and stating:  "I want outside counsel, if that's the route we must now take, retained to explore how to terminate the Police Chief for not doing his job."  Doc. 99-1, pp. 48–49.

On February 7, 2012, the City Council approved a negative performance evaluation for Lock by a 5-2 vote, with Hazlett, Eley, Rose, Tice, and Pat Bentley ("Bentley") in the majority. *See* Doc. 95, pp. 41, 52–53.  At the meeting, the City Council also voted 4-3 to hold a due process hearing within 30 days with the intent of terminating Lock's employment contract, with Hazlett, Eley, Rose, and Tice in the majority.  *See id.* at 53–56.  The City Council directed outside counsel to draft an appropriate notice of the upcoming due process hearing for delivery to Lock, *see id.* at 56, and Lock acknowledges receipt of the notice.  Lock Dep., 173:3–6.  Following the meeting, Rose wrote a news article containing a "summary timeline" of the Schrum incident and observing that council members "may soon be required to consider how to judge the decisions the Chief made in response to Commander Schrum's violation of the public trust."  Doc. 99-1, p. 65.

During the interim period between the February 7, 2012 City Council meeting and the eventual due process hearing, City Council members continued to express displeasure over Helms' cash donation to Mettrick during the 2010 election campaign. On March 28, 2012, Hazlett sent an email to Mettrick threatening to file ethics charges against him and Helms as a result of Helms' cash donation to Mettrick during the 2010 election campaign. *See* Doc. 99-1, p. 64. In addition, Lock avers that during a City Council meeting held on April 17, 2012, Rose, while discussing the pending report from the City's outside legal counsel, said: "We didn't have to talk about, um, the illegal campaign contribution that was a first degree misdemeanor." Lock Aff., ¶¶ 3–4.

On April 27, 2012, the City's outside legal counsel, Al McKenna ("McKenna"), issued his findings and opinions regarding Lock's actions and inactions in addressing Schrum's theft of prescription drugs from the evidence room. *See* Doc. 69-2. McKenna opined that Lock had committed "misfeasance" in the performance of his official duties by: (1) failing to terminate or arrest Schrum following discovery of the theft; (2) assisting Schrum in obtaining a disability pension in spite of provisions of state law and the City code that would have arguably justified forfeiture of the pension; and (3) failing to report Schrum's theft to the City Council. *See id.* at 1, 17. McKenna therefore concluded that Lock could be terminated "for cause" under his employment contract. *See id*.

On May 3, 2012, the City Council held a due process hearing to determine whether to terminate Lock's employment. JSF, ¶ 22; Lock Dep., 173:11–16. Lock was represented by counsel and had the opportunity to testify and present witnesses. Lock Dep., 173:20–174:1. At the conclusion of the hearing, the City Council voted to terminate Lock's employment by a 5-2 vote, with Hazlett, Eley, Rose, Tice, and Bentley in the majority. JSF, ¶ 22. Each of the City Council members who voted in favor of terminating Lock's contract avers that they did so due to

Lock's failure to properly investigate and report the Schrum incident, as well as Lock's efforts to

obtain a pension for Schrum, and not because of any political motivations.  *See* Rose Aff., ¶¶ 7,

13; Eley Aff., ¶¶ 7, 13; Hazlett Aff., ¶¶ 7, 13; Doc. 69-7, Affidavit of Pat Bentley, ¶¶ 7, 12; Doc.

69-8, Affidavit of John Tice ("Tice Aff."), ¶¶ 7, 13.  Thereafter, the City denied Lock's request for

a post-termination hearing, taking the position that such a hearing was not required under Lock's

employment contract.  Doc. 95, p. 39.

### B.    Procedural History

On May 4, 2012, Lock filed a Complaint in this Court alleging various federal and state

law claims against the City and the Individual Defendants.  *See* Doc. 1.  After obtaining leave of

court, Lock filed an Amended Complaint and, thereafter, a Second Amended Complaint.  *See*

Docs. 30, 43.  The Second Amended Complaint asserts the following Counts:  (1) Count I – claim

under 42 U.S.C. § 1983 for violation of Lock's First and Fourteenth Amendment rights to freedom

of speech and association based on termination of employment due to political patronage (City);

(2) Count II – claim under 42 U.S.C. § 1983 for violation of Lock's Fifth and Fourteenth

Amendment rights to substantive due process (City); (3) Count III – claim under 42 U.S.C. § 1983

for violation of Lock's Fifth and Fourteenth Amendment rights to procedural due process (City);

(4) Count IV – breach of contract (City); (5) Count V – intentional infliction of emotional distress

(Individual Defendants); (6) Count VI – tortious interference with a contractual relationship

(Individual Defendants); (7) Count VII – violation of Fla. Stat. § 448.045 (Individual Defendants).

*See* Doc. 43.

Following discovery, the City and the Individual Defendants filed motions for summary

judgment.  *See* Docs. 66–69.  On December 23, 2013, the Court granted the City's motion as to

each of Lock's federal claims (Counts I, II, and III).  *See* Doc. 140 at 32.  The Court declined to

retain supplemental jurisdiction over the state-law claims against the City (Count IV) and the

Individual Defendants (Counts V, VI, VII). *Id.* at 30-32. The Court therefore denied without prejudice the City's motion as to Count IV and the Individual Defendants' motions in their entirety. *Id.* at 33. On December 24, 2013, the clerk entered judgment in favor of the City as to Counts I, II, and III of the Second Amended Complaint. Doc. 141.

On December 30, 2013, Lock filed a Motion for Reconsideration as to the portion of the December 23, 2013 order granting summary judgment on Lock's First Amendment claim (Count I). Doc. 142. The Court based that portion of the order on Lock's status as a "policymaking" employee. *See* Doc. 140, pp. 21-22. In the motion for reconsideration, Lock argued that the issue of whether he was a policymaking employee was an affirmative defense, which the City waived by failing to raise the defense in its answer or motion for summary judgment. Doc. 142, pp. 2-3. On January 21, 2014, Lock filed a Notice of Appeal as to the December 23, 2013 order and the December 24, 2013 judgment. Doc. 148.

On May 28, 2014, following a hearing and a telephonic status conference (Docs. 158, 162), the Court granted Lock's motion for reconsideration (Doc. 163, p. 4). The Court vacated the December 23, 2013 order and the December 24, 2013 judgment, granting any party leave to file a motion to amend its pleading. Doc. 163, p. 5. On May 29, 2014, the City filed a Motion for Leave to File an Amended Answer and Affirmative Defenses, in which the City proposed adding a twenty-sixth affirmative defense regarding Lock's status as a policymaking employee. Doc. 164. On July 14, 2014, the Court entered an order granting the motion and allowing the parties to conduct discovery as to the twenty-sixth affirmative defense. Doc. 170, p. 4. The order further provided that, within 30 days of the close of discovery, the parties could renew any previously-submitted motions for summary judgment and/or brief newly-asserted issues. *Id.* at 4-5.

The parties then filed the motions currently pending before the Court.  On October 9, 2014, the Individual Defendants refiled their original motions for summary judgment (Docs. 172-174), and Lock responded by adopting his previous opposition brief (Docs. 99, 175).  On October 27, 2014, the City filed an Amended Renewed Motion for Summary Judgment, which incorporated and reasserted the arguments contained in the City's initial Motion for Summary Judgment (Doc. 69), and included new briefing on the issue of Plaintiff's status as a policymaking employee (Doc. 179).  In response, Lock incorporated and reasserted the arguments in his original opposition brief (Doc. 95), and opposed the City's motion as to his status as a policymaking employee (Doc. 180).

Because the Court vacated the December 23, 2013 order designated for appeal, the Eleventh Circuit Court of Appeals dismissed Lock's appeal as moot, which issued as the mandate on January 23, 2015.  *See* Doc. 182.  The Court determines that oral argument is unnecessary, and this matter is therefore ripe for review.

## II.      STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact.  *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48. A fact is "material" if it may affect the outcome of the suit under governing law. *Id.* at 248. In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Id.* at 255

## III.   DISCUSSION

### A.   Political Affiliation Retaliation

In Count I of the Second Amended Complaint, Lock alleges that he was terminated based on his perceived political affiliation with Helms and Mettrick, political rivals of Eley, Hazlett, and Rose. Doc. 43, ¶¶ 13-19, 25; Doc. 95, p. 4. When a public employee suffers an adverse employment action based on his political affiliation, the Eleventh Circuit employs a "categorical approach," under *Elrod v. Burns*, 427 U.S. 347 (1976) and *Branti v. Finkel*, 445 U.S. 507 (1980). *See McCabe v. Sharrett*, 12 F.3d 1558, 1565 (11th Cir. 1994); *McKinley v. Kaplan*, 262 F.3d 1146, 1150 n.4 (11th Cir. 2001). Pursuant to the *Elrod-Branti* categorical approach, a public employee may not be discharged based on political affiliation "unless political affiliation is a reasonably appropriate requirement for the job in question." *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996). Accordingly, "the relevant inquiry is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of

the public office involved." *Stough v. Gallagher*, 967 F.2d 1523, 1527 (11th Cir. 1992) (internal quotation marks omitted).[12]

    To prevail on a political affiliation claim, a plaintiff must make two threshold showings: (1) the plaintiff's behavior consists of constitutionally-protected political affiliation or belief; and (2) the plaintiff actually suffered an adverse employment action. *McCabe*, 12 F.3d at 1565 n.8. Additionally, if the employer denies taking the adverse employment action solely because the plaintiff exercised constitutionally-protected association or belief, the plaintiff must show that political affiliation was "a substantial or motivating factor for the challenged action." *Id*. at 1565 n.5 & n.8; *Tanner v. McCall*, 625 F.2d 1183, 1192 (5th Cir. 1980). If the plaintiff demonstrates that his protected activity was a substantial motivating factor, an employer may still avoid liability by proving that the plaintiff would have been terminated even in the absence of protected activity. *McCabe*, 12 F.3d at 1565 n.5; *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 (11th Cir. 1995).

    In its original and renewed motions for summary judgment, the City does not contest Lock's ability to prove the two threshold elements of his claim: that he engaged in constitutionally-protected political affiliation or belief,[13] and that he actually suffered an adverse employment

---

[12] By contrast, when a public employee is discharged based on the employee's speech or expression, courts employ the familiar *Pickering* balancing test to weigh the employee's interest in commenting on matters of public concern against the interest of the government in promoting the efficiency of the public services it performs. *McKinley*, 262 F.3d at 1150 n.4; *see Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Although Lock also alleged protected political speech in his Second Amended Complaint (Doc. 43, ¶ 22), Lock does not currently point to any protected speech, and both Lock and the City brief Count I under the *Elrod-Branti* line of cases.

[13] The Circuit Courts of Appeal have expressed differing views as to whether a plaintiff may pursue a First Amendment claim based on perceived political affiliation. *Compare Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 299-300 (6th Cir. 2012) (holding that "actual" affiliation is not required for a political-affiliation retaliation claim), *with Heffernan v. City of Paterson*, 777 F.3d 147, 154 (3d Cir. 2015) (holding that no cause of action exists for a perceived-association

action.  The City instead argues that Lock is unable to show that political affiliation was the reason for his termination.  Even if it were, the City argues that Lock's termination was permissible under the *Elrod-Branti* categorical approach.  These arguments are addressed in turn.  As discussed below, the Court concludes that the City's motion is due to be denied on both grounds.

      *1.*     *Causation*

To establish that political affiliation was "a substantial motivating factor" in an adverse employment action, a plaintiff may rely on statistical, direct, or circumstantial evidence.  *Tanner*, 625 F.2d at 1191-93.  The plaintiff's burden "is not a heavy one," and there is no "single standard" for determining whether a plaintiff's protected activity was a substantial or motivating factor in the employment decision.  *Stanley v. City of Dalton*, 219 F.3d 1280, 1291 (11th Cir. 2000) (internal quotation marks omitted).   Courts consider the record as a whole, including:

> (1) the temporal proximity between the termination and the protected activity; (2) whether any reasons for the termination were pretextual; (3) whether any comments made, or actions taken, by the employer indicate the discharge was related to the protected speech; (4) whether the asserted reason for the discharge varied; and (5) any circumstantial evidence of causation, including such facts as who initiated any internal investigations or termination proceedings, whether there is evidence of management hostility to the speech in question, or whether the employer had a motive to retaliate.

*Kamensky v. Dean*, 148 F. App'x 878, 881 (11th Cir. 2005) (citing *Stanley*, 219 F.3d at 1291 n.20).

Although Lock first argues that there is direct evidence of the City's unlawful motive, that argument is not persuasive.  Lock cites four statements: (1) Eley's statement to Lock that if Lock did not fire Helms, Eley would "get rid of" Lock (Lock Dep., 186:25-188:4); (2) Hazlett's statement to Jones that Lock would be "okay" if Lock fired Helms (Jones Aff., ¶ 32); (3) Hazlett's statement to Jones, on a different occasion, that Lock needed to do something about Helms or it

---

retaliation claim, when it is based on a factual mistake, as opposed to a plaintiff's "stand of calculated neutrality").

would "not be a good result for Lock" (*Id.* at ¶ 25); and (4) Tice's statement to Schrum that "none of this would have been necessary if [Lock] had fired Helms," in apparent reference to the publicity regarding the Schrum incident (Schrum Aff., ¶¶ 2, 4).

"Direct evidence is '[e]vidence, which if believed, proves existence of fact in issue *without inference or presumption.*'" *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528, n. 6 (11th Cir.1987) (quoting *Black's Law Dictionary* 413 (5th ed. 1979)).  In this case, the issue in dispute is whether the City was motivated to terminate Lock due to Lock's perceived political affiliation.  The foregoing statements do indicate that Eley and Hazlett were motivated to terminate Lock, if Lock did not fire Helms.  However, the statements do not, on their face, suggest that Eley and Hazlett were motivated to terminate Lock (or Helms) for unlawful political reasons.  To reach that conclusion, a factfinder would have to make an additional inference: that Eley and Hazlett wanted Helms fired for political reasons, such as Helms' support of Mettrick.  Because the statements do not demonstrate political animus "without inference or presumption," they do not constitute direct evidence of intent.  *Rollins*, 833 F.2d at 1528.

Nonetheless, the statements demonstrate that Eley and Hazlett possessed the intent to take action against Lock if he did not fire Helms, which is a relevant factor in assessing causation.  *See Schneider v. Indian River Cmty. Coll. Found., Inc.*, 875 F.2d 1537, 1543 (11th Cir. 1989) (president's statements that he wanted to "get rid" of plaintiff and other expressions of animosity created a genuine issue of fact as to causation); *Fikes v. City of Daphne*, 79 F.3d 1079, 1084-85 (11th Cir. 1996) (police chief's statement that he wanted the plaintiff out of the police department was relevant evidence of causation).  Moreover, additional evidence does suggest that Hazlett and Rose wanted Helms fired for political reasons.  For instance, Hazlett sent emails denouncing Helms' appearance with Mettrick in the Police Alumni Association brochure, accusing Helms of

running "rogue politically," criticizing Lock for "defend[ing]" Helms, and stating his belief that Lock "now has taken the strategy, with his political pal Helms, to simply harass me and use his badge to run me off." Doc. 99-1, pp. 1-5, 18, 20, 34. Rose also stated that he was unhappy with Helms' campaign donation to Mettrick, and that Lock had not taken action against Helms. Lock Dep., 218:12-20.

In its original motion for summary judgment, the City contends that Lock was terminated because of his handling of the Schrum incident, not because of his political affiliation. Eley, Hazlett, Rose, and Tice each aver that they voted for Lock's termination because Lock failed to disclose Schrum's theft, allowed Schrum to claim a pension, and failed to direct a criminal investigation or an internal affairs investigation into the Schrum incident. Eley Aff., ¶ 13; Hazlett Aff., ¶ 13; Rose Aff., ¶ 13; Tice Aff., ¶ 13. The City also cites the opinion of its expert, Major Martin Linnekugel of the Seminole County Sheriff's Office, who concluded that Lock's actions with respect to the Schrum incident constituted a neglect of duty. Doc. 69-3, Affidavit of Martin Linnekugel, ¶ 33.[14]

Lock responds that multiple facts undermine the City's stated reasons for his termination, indicating that the City's stated reasons are pretextual. *See* Doc. 95 at 6-18; *Kamensky*, 148 F. App'x at 881 (identifying pretextual reasons for firing as a relevant consideration in assessing causation). Among other points, Lock asserts that the City has identified no affirmative duty requiring him to report the Schrum theft to the City Council, and that McKenna's investigative report acknowledged that there may have been no specific duty to report the theft. Doc. 69-2, p. 13. Lock also maintains that he did promptly report the theft to Wolfinger in July 2009, he ordered

---

[14] Lock filed a motion *in limine* to exclude Linnekugel's testimony at trial (Doc. 117), which the Court denied without prejudice (Doc. 131).

Czernik to conduct a criminal investigation, and he sent a Confidential Information Report to

Holmes in September 2009.  Lock Dep., 117:10-17; 98:20-100:16; JSP, ¶ 15; Doc. 69-1.  As to

Schrum's pension, Lock argues that, contrary to Jensen's testimony (Jensen Dep., 14:11-16:1), he

did tell Jensen that Schrum was under investigation for a felony involving illegal prescription drugs

(Lock Aff., ¶ 6), and that Jensen admitted that she had "real difficulty remembering the actual

specifics of the conversation" (Jensen Dep., 13:18-19).  Lock also contends that he reported the

Schrum incident to another Pension Board member, Charles Finstead.  Lock Aff., ¶ 9.

As additional evidence of pretext, Lock notes that the City was inconsistent in disciplining

the officers involved in the Schrum incident.  In particular, although McKenna's report concluded

that Lock, Czernik, and Helms each prevented Schrum's prosecution (Doc. 69-2, p. 4), Czernik

was not disciplined (Helms Dep., 76:5-10; Helms Aff., ¶ 4).  Helms, by contrast, was fired in

September 2012.  Helms Dep, at 75:14-76:1.  Lock argues that there is no evidence that Czernik's

political affiliation was a concern to the City Council, further suggesting that Lock's termination

and Helms' termination were, in fact, politically-motivated.

To the extent that the City challenges the temporal proximity between Lock's protected

activity and his termination, the Court finds that any lapse in time does not preclude the existence

of a genuine issue of material fact as to causation.  As late as September and November 2011, Eley

and Hazlett demanded that Lock fire Helms.  Lock Dep., 186:25-188:4; Jones Aff., ¶ 32.  Hazlett

began calling for Lock to resign in November 2011, the City Council approved a negative

performance evaluation in February 2012, and Lock was terminated in May 2012.  Doc. 99-1, pp.

38-39; Doc. 95, pp. 52-53; JSF, ¶ 22.  Under these circumstances, there is a sufficient temporal

nexus between Lock's alleged protected activity and the adverse employment action.  *See*

*Beckwith*, 58 F.3d at 1566 (noting that a reasonable jury could infer that the defendants "used a

relatively slow and deliberate process," lasting over one year, to terminate the plaintiff); *Schneider*, 875 F.2d at 1543 n.9 (holding that lapse of 10 months did not preclude the existence of a genuine issue of material fact).

Accordingly, after considering the record as a whole, and taking all legitimate inferences in favor of Lock, the Court finds that Lock has produced adequate evidence to create a jury issue as to causation.

### 2. *Elrod-Branti categorical approach*

In the renewed motion for summary judgment, the City argues that Lock's termination was nonetheless permissible under the *Elrod-Branti* categorical approach. As discussed, the pertinent inquiry is whether political affiliation was "a reasonably appropriate requirement" for Lock's job. *O'Hare Truck Serv., Inc.* 518 U.S. at 714; *Stough*, 967 F.2d at 1527. Historically, courts have found that political affiliation is a reasonably appropriate requirement for certain "confidential" and "policymaking" employees. *See Barrett v. Thomas*, 649 F.2d 1193, 1201 (5th Cir. 1981). As a general rule, the question of whether an employee is a confidential or policymaking employee under *Elrod-Branti* is a question of fact. *Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1349 (11th Cir. 2013); *Underwood v. Harkins*, 698 F.3d 1335, 1345 (11th Cir. 2012). However, the Eleventh Circuit has held that an employer may prevail, as a matter of law, in cases involving: (1) confidential employees who act as an "alter ego" of the employer; and (2) certain policymaking employees, when there is evidence that political affiliation is a reasonably appropriate requirement for their job. As discussed below, the City has failed to demonstrate entitlement to summary judgment under either theory.

### a. Confidential alter ego

The Eleventh Circuit has consistently held that an employer may fire an immediate subordinate based on the subordinate's political affiliation, "if the subordinate, under state or local law, has the same duties and powers as the elected official." *Underwood*, 698 F.3d at 1343. As the court has explained, "[t]here is no likely circumstance in which a shared ideology is more important than when an elected official appoints a deputy who may act in his or her stead." *Id.* (internal quotation marks omitted). Thus, a sheriff may fire a deputy sheriff based on political affiliation, and a clerk may fire a deputy clerk. *E.g.*, *Terry v. Cook,* 866 F.2d 373, 377 (11th Cir. 1989) (holding that deputy sheriff was an alter ego of the sheriff under state law), *Cutcliffe v. Cochran*, 117 F.3d 1353, (11th Cir. 1997) (same); *Underwood*, 698 F.3d at 1345 (holding that deputy clerk was the alter ego of the clerk under state law). Most recently, the Eleventh Circuit held that a local school board could fire a school superintendent because the superintendent was the board's alter ego, under Georgia law. *Leslie*, 720 F.3d at 1351. Notably, the question of whether an employee is an "alter ego" is not dependent on "what the subordinate actually does on a day-to-day basis, but rather what the subordinate is legally empowered to do under state or local law." *Id.* at 1350 (quoting *Underwood*, 698 F.3d at 1344).

In the renewed motion for summary judgment, the City does not specifically invoke the "alter ego" theory. *See* Doc. 179, pp. 12-13. The City also cites no evidence suggesting that Lock "was the executive officer on whom the [City Council] relied for the enforcement of its policies." *Leslie*, 720 F.3d at 1351. Nor is there any indication that Lock was the "general agent" of the City Council, with authority to enter into transactions on behalf of the City Council. *Terry*, 866 F.2d at 377. Indeed, Lock persuasively argues that City Manager Morgan, not Lock, is the City's "general agent," as he is "the chief administrative officer of the city" and is "responsible to the

council for all the administration of city affairs placed in his charge by this Charter." *See* West

Melbourne, Fla., Charter art. V, § 4; Morgan Dep. I, 7:13–8:9.

By contrast, Lock's authority under the City Charter, as Chief of Police, was limited to the

police department and law enforcement.  The Charter provides that "[t]he chief of police shall be

the head of the police department," and "[t]he chief of police and his designees shall aid in the

enforcement of order and enforce the city's ordinances; shall execute all papers and processes of

the city or its authorities, and shall perform such other duties as may be lawfully required of him."

*See* West Melbourne, Fla., Charter art. XI, § 2.  The City cites no evidence suggesting that Lock

had authority over other City departments, sufficient to grant Lock the same "powers and duties"

as the City Council.  *Underwood*, 698 F.3d at 1343.  Accordingly, the City has not demonstrated,

as a matter of law, that Lock was "empowered by law to act as the alter ego of [his] employer."

*Leslie*, 720 F.3d at 1351.

### b.      *Policymaking employee*

In the renewed motion for summary judgment, the City does specifically argue that Lock

was a "policymaking" employee under *Elrod-Branti*.  Although the City devotes the majority of

its brief to Lock's status as a policymaker, the City fails to address whether political affiliation

was a "reasonably appropriate requirement" for Lock's job.  As a result, Lock contends that the

City has failed to meet its burden as the party moving for summary judgment.  Lock also maintains

that a genuine issue of material fact exists as to whether political affiliation is a reasonably

appropriate requirement for Lock's job.  The Court agrees on both points.

Although the question of whether an employee is a "policymaker" is relevant, the ultimate

question is whether political affiliation is a reasonably appropriate requirement for the job.

*Barrett*, 649 F.2d at 1201 (explaining that the terms "confidential" and "policymaker" are relevant,

but "any specific application of the exception must turn on the importance of political loyalty to

the execution of the employee's duties").  This inquiry is necessary because, under *Branti*, "party

affiliation is not necessarily an appropriate requirement for the effective performance of all

policymakers." *Gordan v. Cochran*, 116 F.3d 1438, 1440 (11th Cir. 1997).  The Eleventh Circuit

has affirmed summary judgment in favor of an employer based on the policymaking exception,

but only when there was evidence that an employee was a policymaker *and* the employee's

political affiliation was a reasonably appropriate requirement of the job.  *See id.* at 1440; *Ray v.*

*City of Leeds*, 837 F.2d 1542, 1544 (11th Cir. 1988); *cf. Parrish v. Nikolits*, 86 F.3d 1088, 1093

(11th Cir. 1996) (vacating summary judgment where the district court failed to address whether

party affiliation was an appropriate requirement for the effective performance of the positions at

issue).

In its original and renewed motions, the City cursorily argues that "[Lock's] efficiency and

loyalty to the City Council is of the utmost importance[.]"  Doc. 69, p. 17; Doc. 179, p. 5.  The

City cites no evidence in support of this contention.  *See* Doc. 69, pp. 17-18; Doc. 179, pp. 5-6.

By failing to meaningfully address the question of whether political affiliation is a reasonably

appropriate requirement for Lock's job, the City fails to discharge its burden as the party moving

for summary judgment.  *Celotex*, 477 U.S. at 323 (explaining that the moving party bears the initial

burden of stating the basis for its motion and identifying those portions of the record demonstrating

the absence of genuine issues of material fact).

Moreover, even assuming that the City has discharged its initial burden, and assuming that

Lock is a policymaker, Lock cites sufficient evidence to create an issue of fact as to whether

political affiliation is a reasonably appropriate requirement for his job.  Specifically, City Manager

Morgan testified that political affiliation and loyalty are *not* appropriate requirements for Lock's

position of Chief of Police.  Doc. 180-5, Rule 30(b)(6) Deposition of Scott Morgan ("Morgan Dep. II"), pp. 55:13-56:1; *see also* Morgan Dep. I, p. 69:13-19.  Lock also submits a supplemental affidavit detailing the reasons that political affiliation and loyalty are not reasonable conditions for the effective performance of law enforcement functions.  Doc. 180-4, Affidavit of Brian Lock, ("Lock Supp. Aff."), ¶¶ 8-9.

Lock further argues that his employment agreement with the City does not list political affiliation as one of the enumerated "causes" for which he may be fired.  *See* Doc. 43-1, p. 8.  Likewise, Lock maintains that the City's personnel policies---which are incorporated into his employment agreement by reference---specifically prohibit "[c]oercion of or by an employee for political purposes and using the position of employment for political purposes."  Doc. 180-3, p. 1; Doc. 43-1, p. 7.  Although not dispositive, Lock convincingly argues that these facts "cut[] against any claim that political affiliation was an appropriate requirement for [his] job."  *Morin v. Tormey*, 626 F.3d 40, 46 (2d Cir. 2010).

Based on the foregoing, the Court finds that the City has not demonstrated entitlement to the *Elrod-Branti* affirmative defense as a matter of law.  For the reasons explained above, the City is not otherwise entitled to summary judgment on Lock's First Amendment claim, and the City's motion is therefore denied as to Count I.

### B.      Substantive Due Process

The Due Process Clause of the Fourteenth Amendment prohibits the states from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  "The substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'" *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)).  "A finding that a right merits substantive due process protection means that the

right is protected against certain government actions regardless of the fairness of the procedures used to implement them.'" *Id.* (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).

In Count II of the Second Amended Complaint, Lock asserts that the City violated his substantive due process rights by depriving him of his "contractual property right" to continued employment by arbitrary and pretextual means. Doc. 43, ¶¶ 30–36. The City argues that Lock's substantive due process claim completely overlaps with his First Amendment claim, and therefore must be analyzed under First Amendment standards rather than the more generalized notion of substantive due process.[15] *See* Doc. 69, pp. 20–21 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) ("[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.")). In response, Lock maintains that his substantive due process claim arises from his Fifth and Fourteenth Amendment property rights created by his employment contract, and therefore differs from his First Amendment claim. *See* Doc. 95, pp. 19–20.

Even if the Court were to accept Lock's argument that his substantive due process claim should be analyzed separately from his First Amendment claim, his claim would be completely foreclosed by the Eleventh Circuit's decision in *McKinney*. In *McKinney*, the plaintiff alleged that he was terminated from his position as a county building official because the county commissioners were biased against him due to his strict enforcement of the county's building codes. 20 F.3d at 1554. The county's policies provided that a county employee could only be

---

[15] The Court has already performed this analysis, concluding that Lock's First Amendment claim survives summary judgment. *See supra*, Part III.A.

terminated "for cause," including incompetence or inefficiency in carrying out his duties.  *Id.*  In accord with the policies, the county provided the plaintiff with written notice of his proposed termination and the reasons therefor, and held a hearing to consider the charges.  *Id.* at 1554–55.  The plaintiff attended the hearing, with counsel, and had the opportunity to hear the charges against him, cross-examine the county's witnesses, and present his own case.  *Id.* at 1555.  After the county commissioners upheld the charges against the plaintiff and terminated his employment, the plaintiff brought an action under 42 U.S.C. § 1983 alleging that the charges against him were pretextual and that he had therefore been denied substantive due process of law.  *Id.*  On appeal, the Eleventh Circuit, sitting *en banc*, overruled prior decisions of its panels and held broadly that a government employee possessing a state-created property interest in his employment, such as the plaintiff before it, states only a procedural due process claim, rather than a substantive due process claim, when he alleges that he was deprived of that employment interest by an arbitrary and capricious non-legislative government action.  *Id.* at 1560.  The *McKinney* court explained that since employment rights are state-created rights and are not "fundamental" rights created by the Constitution, they do not enjoy substantive due process protection.  *Id.*

The holding in *McKinney* is directly applicable here.  Lock had a state-created property right, via his employment contract, to continued employment with the City unless and until the City terminated him "for cause."  *McKinney* teaches that, contrary to Lock's argument, *see* Doc. 95, p. 21 n.30, his right to employment with the City was therefore not a "fundamental" right created by the Constitution.  20 F.3d at 1560.  Thus, in alleging that he was deprived of this right by arbitrary and pretextual means, he merely states a procedural due process claim.  *See id.*  His substantive due process claim must therefore be dismissed.

C.     **Procedural Due Process**

The procedural component of the Due Process Clause requires that the state provide fair procedures and an impartial decisionmaker before infringing on a person's interest in life, liberty, or property. *Id.* at 1561. Specifically, a "'tenured employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story' before a state or state agency may terminate an employee. In other words, the employee is entitled to 'some kind' of pre-termination hearing." *Id.* (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 546 (1985) (internal citations omitted)). Lock acknowledges that he received written notice of his pretermination hearing, that he heard the evidence against him, and that, with the assistance of counsel, he had the opportunity to present his side of the story through his own testimony and through the testimony of witnesses he called. *See* Lock Dep., 173:3–174:1. Thus, he does not dispute that he received all of the process required with respect to pretermination hearings under *Loudermill*. *See McKinney*, 20 F.3d at 1561–62. Rather, he contends that his pretermination hearing was constitutionally inadequate because the decision was preordained, as a majority of the City Council members had already agreed to terminate him regardless of whatever exonerating evidence he would present at the hearing. *See* Doc. 43, ¶¶ 37–45; Doc. 95, pp. 21–23. The City asserts that it is entitled to summary judgment because Lock had an adequate remedy, via a post-termination lawsuit in state court, to correct any procedural deprivations that occurred during a supposedly preordained City Council hearing. *See* Doc. 69, pp. 21–23. The Court agrees with the City, again finding *McKinney* to prove fatal to Lock's claim.

In *McKinney*, after the Eleventh Circuit decided that the plaintiff only stated a procedural due process claim, rather than a substantive due process claim, in alleging a pretextual termination from his position as a county building official, *see supra* Part III.B, the court proceeded to address

his procedural due process claim.    Addressing the plaintiff's allegations that the county commissioners were biased against him and therefore could not provide him a constitutionally adequate pretermination hearing, the court explained the law for courts to apply when considering allegations of decisionmaker bias:

> [D]ue process is satisfied when the challenger has an opportunity to present his allegations and to demonstrate the alleged bias.    A demonstration that the decisionmaker was biased, however, is not tantamount to a demonstration that there has been a denial of procedural due process.    As we mention above, unlike substantive due process violations, procedural due process violations do not become complete "unless and until the state refuses to provide due process." *Zinermon*, 494 U.S. at 123, 110 S.Ct. at 983.  More specifically, in the case of an employment termination case, "due process [does not] require the state to provide an impartial decisionmaker at the pre-termination hearing.  The state is obligated only to make available 'the means by which [the employee] can receive redress for the deprivations.'" *Schaper v. City of Huntsville*, 813 F.2d 709, 715–16 (5th Cir. 1987) (quoting *Parratt v. Taylor*, 451 U.S. 527, 543, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981)) (footnote omitted).
>
> In *Parratt* (and its progeny, *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)), the Supreme Court held that due process did not require pre-deprivation hearings where the holding of such a hearing would be impracticable, that is, where the deprivation is the result of either a negligent or an intentional deprivation of property.  All that due process requires, the Court said, is a post-deprivation "means of redress for property deprivations satisfy[ing] the requirements of procedural due process." *Parratt*, 451 U.S. at 537, 101 S.Ct. at 1914; *accord Hudson*, 468 U.S. at 533, 104 S.Ct. at 3204.
>
> The precedent established by *Parratt* is unambiguous:  even if McKinney suffered a procedural *deprivation* at the hands of a biased Board at his termination hearing, he has not suffered a *violation* of his procedural due process rights unless and until the State of Florida refuses to make available a means to remedy the deprivation. As any bias on the part of the Board was not sanctioned by the state and was the product of the intentional acts of the commissioners, under *Parratt*, only the state's refusal to provide a means to correct any error resulting from the bias would engender a procedural due process violation.

20 F.3d at 1562–63.    Thus, the *McKinney* court made clear that decisionmaker bias at a pretermination hearing resulting in an unauthorized and intentional deprivation of property only gives rise to a procedural due process claim when there is no constitutionally adequate state remedy to address the bias.  *See id.*

Because the plaintiff asserted that the state remedy—review by Florida courts—was constitutionally inadequate, the *McKinney* court proceeded to consider that question. *Id.* at 1563. First, the court surveyed Florida law and determined that Florida courts had the authority to review employment termination cases and to cure violations of due process by granting the relief sought by the plaintiff—a new hearing conducted by a fair tribunal. *Id.* (citing Florida cases). Next, the court found that the scope of the Florida courts' review would encompass the plaintiff's claims that he was denied due process by an impartial decisionmaker, because Florida courts had the power to undertake broad reviews of all aspects of the case to determine whether due process was observed. *Id.* (citing Florida cases). Finally, the court determined that the plaintiff's state remedy was adequate because Florida courts had the power to remedy the plaintiff's loss both in terms of damages and equitable relief. *Id.* at 1564. The court reasoned that under *Parratt, supra*, "the state's remedial procedure need not provide all relief available under section 1983; as long as the remedy 'could have fully compensated the [employee] for the property loss he suffered,' the remedy satisfies procedural due process." *Id.* (quoting *Parratt*, 451 U.S. at 544) (internal citations omitted). The court concluded that since Florida's procedures were capable of providing him with all the relief constitutionally warranted, the plaintiff's state remedy satisfied procedural due process and alleviated any deprivation he had suffered in a pretextual hearing before the county commissioners.[16] *Id.*

Like the plaintiff in *McKinney*, Lock asserts that his pretermination hearing was pretextual because the outcome was preordained. Even assuming that Lock is correct in this regard,

---

[16] The court noted that the plaintiff's claim was not being dismissed for *failure to exhaust state remedies*. *Id.* at n.20. Rather, the court held that the fact that an adequate state remedy was available meant that the plaintiff *failed to state a claim* for a procedural due process violation under *Parratt* and its progeny. *Id.*

*McKinney* teaches that because the alleged deprivation was the result of the pretextual—and therefore unauthorized and intentional—acts of the City Council members, he has not suffered a violation of his procedural due process rights "unless and until the State of Florida refuses to make available a means to remedy the deprivation." *Id.* at 1563. Lock cannot make this showing. Indeed, Lock has offered no developments in Florida law which would negate the *McKinney* court's conclusion that Florida courts provide a constitutionally adequate remedy for employment termination cases resulting from a pretextual pretermination hearing. Instead, Lock attempts to distinguish *McKinney*, arguing that his property right was "based on a fixed-term bilateral contract (as opposed to a state-law-created property interest consisting of a unilaterally granted expectancy), which specifically provides a property right to a pre-deprivation hearing, and which provides a 'present entitlement' to gainful employment." Doc. 95, p. 21. However, the mere fact that the *McKinney* plaintiff's property right was created by the county's policy manual, while Lock's was created by contract, is not a meaningful distinction. *McKinney* does not recognize any such distinction, and instead applies broadly to *all* state-created property rights, regardless of how they are created.

Lock also argues that the Supreme Court's decisions in *Zinermon v. Burch*, 494 U.S. 113 (1990), and *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189 (2001), limited the reach of *Parratt*, upon which the *McKinney* court relied in holding that only the state's refusal to provide a means to remedy a pretextual pretermination hearing would give rise to a procedural due process claim. *See* Doc. 95, p. 22. In *Zinermon*, the Supreme Court held that the plaintiff properly stated a procedural due process claim when he alleged that employees at a Florida state-owned hospital had failed to afford him pre-deprivation safeguards in admitting him to the hospital as a "voluntary" mental patient when he was actually incompetent to give informed consent to his

admission.  494 U.S. at 115, 139.  In holding that a post-deprivation state remedy was constitutionally inadequate, the Court explained that *Parratt* was inapplicable because:  (1) the admitted patient's deprivation was predictable; (2) pre-deprivation process was not impossible, and (3) the hospital employees could not claim that their conduct was "unauthorized" by the state. *Id.* at 135–39.

Lock's reliance on *Zinermon* is misplaced.  In *McKinney*, decided *after* the Supreme Court's decision in *Zinermon*, the Eleventh Circuit found that *Parratt*'s rationale *was* applicable, because any bias by the county commissioners was *not* authorized by the state and was the product of intentional acts of the commissioners.  20 F.3d at 1563.  Similarly here, any bias by the City Council members was unauthorized by the state and was the result of their intentional acts. Therefore, *Zinermon* is inapposite and *McKinney* is controlling.

In the other case relied upon by Lock, *Lujan*, the Supreme Court addressed the constitutionality of a California statutory scheme which authorized the state to withhold payments due to a contractor on a public works project if a subcontractor on the project failed to pay its workers a prevailing wage.  532 U.S. at 191.  The statutory scheme permitted the contractor, in turn, to withhold similar sums from the subcontractor.  *Id.*  The plaintiff, a subcontractor which had been denied payment by a contractor after a California labor agency determined that the subcontractor failed to pay the prevailing wage, asserted that the statutory scheme violated its procedural due process rights because the scheme did not afford the subcontractor a hearing before or after the withholding of payment.  *Id.* at 193.  In upholding the constitutionality of the statutory scheme, the Supreme Court concluded that the plaintiff had an adequate remedy via a post-deprivation lawsuit in state court.  *Id.* at 195–99.  In reaching its decision, however, the *Lujan* Court distinguished the case from its prior decisions requiring a prompt pre- or post-deprivation

hearing, explaining that "in each of those cases, the claimant was denied a right by virtue of which he was presently entitled either to exercise ownership dominion over real or personal property, or to pursue a gainful occupation." *Id.* at 196.

Lock interprets *Lujan* as requiring a constitutionally adequate (i.e., unbiased) pretermination hearing when an individual has a "present entitlement" to a continuing benefit, such as the right to pursue gainful employment. *See* Doc. 95, p. 22. However, in each of the cases distinguished by the *Lujan* Court as requiring a prompt pre- or post-deprivation hearing, the issue was the *timeliness* of the hearing under the Due Process Clause, not whether the claimant had an adequate post-deprivation remedy in state court. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993); *FDIC v. Mallen*, 486 U.S. 230 (1988); *Barry v. Barchi*, 443 U.S. 55 (1979). In this case, the dispute is not whether Lock received a timely hearing, but instead whether a post-deprivation suit in state court would be a constitutionally adequate remedy for any bias on the part of the City Council members during the pretermination hearing. After *Lujan*, the Eleventh Circuit has continued to rely upon *Parratt* and *McKinney* in affirming that "when a deprivation of property is random and unauthorized, [a]ll that due process requires . . . is a post-deprivation means of redress for property deprivations satisfy[ing] the requirements of procedural due process. The doctrine extends to both negligent and intentional deprivations by state officials." *Pacesetter Apparel, Inc. v. Cobb County*, 374 F. App'x 910, 912 (11th Cir. 2010) (internal citations and quotation marks omitted); *see also Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1317 (11th Cir. 2011); *Autery v. Davis*, 355 F. App'x 253, 255 (11th Cir. 2009) ("In this circuit, state-court review of employment termination decisions qualifies as an adequate post-deprivation remedy."). Therefore, Lock's reliance on *Lujan* is not persuasive.

In sum, Lock has not shown that the State of Florida refuses to provide him with a constitutionally adequate remedy to correct any unauthorized and intentional deprivation resulting from his pretermination hearing.  To the contrary, Lock has a constitutionally adequate remedy via a post-deprivation lawsuit in the Florida court system.  *See McKinney*, 20 F.3d at 1564.  Therefore, he has failed to state a procedural due process claim, *see id.* at 1564 n.20, and the City is entitled to summary judgment as to Count III of the Second Amended Complaint.

### D.        State Law Claims

####        1.        *Breach of Contract*

In Count IV of the Second Amended Complaint, Lock maintains that the City materially breached his employment agreement, which provided:

> The City Council may terminate Lock with a majority (4) vote of the Council at a properly noticed meeting wherein Lock shall be afforded a hearing, but only "for cause".  "For cause" shall be defined as "the removal from office pursuant to Section 112.51, Florida Statutes; or, a violation of the Code of Ethics for Public Officers and Employees contained in Part III of Chapter 112, Florida Statutes; or, the conviction of any crime involving dishonesty, a felony under the laws of the jurisdiction imposing the penalty; or, malfeasance or misfeasance in the performance of his official duties".

Doc. 43-1, p. 8; Doc. 43, ¶ 48.  Lock alleges that the inactions for which he was terminated did not constitute "cause" as defined in the contract.  Doc. 43, ¶ 48; Doc. 95, p. 23.

Under Florida law, a claim for breach of contract has three elements: (1) a valid contract; (2) a material breach; and (3) damages.  *Havens v. Coast Fla., P.A.*, 117 So. 3d 1179, 1181 (Fla. 2d DCA 2013).  The City argues that it did not breach the employment agreement because it complied with the required termination procedures, including providing a properly-noticed meeting, affording Lock a hearing, and terminating Lock with a majority vote of the City Council.  Doc. 69, p. 24.  As a result, the City maintains that it "substantially performed" under the contract.  *See Strategic Res. Grp,, Inc. v. Knight-Ridder, Inc.*, 870 So. 2d 846, 848 (Fla. 3d DCA 2003)

(explaining that "substantial performance is performance nearly equivalent to what was bargained for") (internal quotation marks omitted).

The City, however, only addresses its compliance with the contractual provision governing the process for Lock's termination.  The City fails to acknowledge that Lock is challenging the related, but separate, contractual term providing that Lock could be discharged only "for cause."  To the extent that the City argues that its compliance with the process provision eliminates its requirement to discharge Lock for cause, that argument is meritless.  It is axiomatic that courts may not rewrite contracts and must give effect to each contractual provision.  *See Fla. Recycling Servs., Inc. v. Greater Orlando Auto Auction, Inc*., 898 So. 2d 129, 131 (Fla. 5th DCA 2005).  To adopt the City's argument would, as Lock argues, eliminate one of the major benefits for which he bargained: termination only for cause.

As discussed above, in connection with Lock's First Amendment claim, Lock persuasively argues that there are factual disputes as to whether he engaged in "misfeasance," the stated "cause" for Lock's termination. *See supra*, Part III.A.  If the City erroneously discharged Lock without "cause," the City breached a material term of the contract.  *Olsen v. Allstate Ins. Co.*, 759 F. Supp. 782, 786 (M.D. Fla. 1991).  Accordingly, a genuine issue of material fact exists as to whether the City breached the employment agreement by not terminating Lock for cause.  *Jimarye, Inc. v. Pipkin*, 181 So. 2d 669, 669 (Fla. 1st DCA 1966) (explaining that whether an employee breached a contract to justify discharge is a question of fact, if there is conflicting evidence).

In the instant motion, the City does not contest Lock's ability to prevail on the other elements of his breach-of-contract claim.  The City's motion for summary judgment is therefore denied as to Count IV.

### 2.    *Intentional Infliction of Emotional Distress*

In Count V of the Second Amended Complaint, Lock brings a state-law claim for intentional infliction of emotional distress against the Individual Defendants.  Doc. 43, ¶¶ 50-56. The Individual Defendants maintain that this claim, as well as Lock's claim for tortious interference with a contractual relationship (Count VI), is barred by absolute immunity, and, alternatively, that the challenged conduct does not rise to the level of "outrageous" conduct required by Florida law.  Because Lock fails to show outrageous conduct, the Court finds that the Individual Defendants are entitled to summary judgment on Lock's claim for intentional infliction of emotional distress.  The issue of absolute immunity is evaluated with respect to Lock's claim for tortious interference in Section III.D.3., *infra.*

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must prove four elements: "(1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct; (3) the conduct caused the emotional distress; and (4) the distress was severe."  *Liberty Mut. Ins. Co. v. Steadman*, 968 So.2d 592, 594 (Fla. 2d DCA 2007).  The alleged behavior must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Id.* (internal quotation marks omitted).  "It is not enough that the intent is tortious or criminal; it is not enough that the defendant intended to inflict emotional distress; and it is not enough if the conduct was characterized by malice or aggravation which would entitle the plaintiff to punitive damages for another tort."  *State Farm Mut. Auto. Ins. Co. v. Novotny*, 657 So. 2d 1210, 1213 (Fla. 5th DCA 1995).  "Whether conduct is outrageous enough to support a claim of intentional infliction of emotional distress is a question of law."  *Liberty Mut. Ins. Co.*, 968 So. 2d  at 595.

The Individual Defendants argue that their alleged conduct is not sufficiently outrageous because they were simply exercising their legal rights and obligations---to investigate and

terminate Lock's employment---in a legally permissible way.  *See Southland Corp. v. Bartsch*, 522 So. 2d 1053, 1056 (Fla. 5th DCA 1988) ("the actor is never liable where he does no more than insist upon his legal rights in a permissible way").  The Court finds that, even taking the inferences in the light most favorable to Lock, he has not demonstrated sufficiently outrageous conduct.

Particularly in the employment context, "Florida courts have been reluctant to find claims for intentional infliction of emotional distress based solely on allegations of verbal abuse."  *De La Campa v. Grifols Am., Inc.*, 819 So. 2d 940, 943-44 (Fla. 3d DCA 2002).  Liability "does not extend to mere insults, indignities, threats, or false accusations."  *Williams v. Worldwide Flight Servs. Inc.*, 877 So. 2d 869, 870 (Fla. 3d DCA 2004).  For instance, in *Williams,* the court held that the plaintiff had not demonstrated sufficiently outrageous conduct where supervisors used racial epithets, instructed another employee to create a record of false disciplinary actions to justify plaintiff's termination, falsely accused the plaintiff of stealing, persistently threatened the plaintiff with termination, and forced him to work in dangerous conditions.  *Id.* at 870-71.  Likewise, in *Scheller v. American Medical International, Inc.*, the court held that the plaintiff failed to demonstrate sufficiently outrageous conduct where the employer falsely accused the plaintiff of theft, falsified documents and bribed witnesses prior to trial, published false information about the plaintiff's income, evicted the plaintiff from his office, withheld support services, and excluded the plaintiff from meetings.  502 So. 2d 1268, 1269-71 (Fla. 4th DCA 1987); *see also Food Fair, Inc. v. Anderson*, 382 So. 2d 150, 151-53 (Fla. 5th DCA 1980) (holding that conduct was not outrageous where plaintiff was threatened with termination if she did not admit to a false accusation and was eventually terminated).

Lock maintains that, because the Individual Defendants were in positions of authority, capable of affecting his legal interests, this case is analogous to *Lashley v. Bowman*, in which the

court found a restaurant owner's conduct was sufficiently outrageous to survive summary judgment. 561 So. 2d 406, 409-10 (Fla. 5th DCA 1990).  In *Lashley*, the restaurant owner had the plaintiff arrested after she refused to pay for an inedible meal, which the court found amounted to the "calculated use of emotional distress to extort money."  *Id.* at 410.  The court reasoned:

> The Restatement, the commentators and this court all agree that outrageousness is more likely to be found where some relationship exists that gives the defendant actual or apparent authority over another or power to affect his interests. When the conduct smacks of extortion, this tort is likely to be present. Somewhat analogous to the case at bar is liability based on the threat by a person impersonating a police officer to arrest the plaintiff unless she surrenders letters in her possession.

*Id.* at 409-10 (citations omitted).  As examples of authority figures, the Restatement identifies police officers, landlords, school authorities, and collecting creditors.  *See* Restatement (Second) of Torts § 46 cmt. e (1965).

Even assuming that an employer falls within this same group of authority figures, the conduct underlying Lock's claims is not as extreme as the conduct at issue in *Lashley*, in which the customer was arrested while in "a social environment" that made the plaintiff "especially vulnerable to misconduct." 561 So. 2d at 410 n.4.  Nor is this case akin to *Gallogly v. Rodriguez*, in which police officers ran a drug and prostitution ring from the plaintiff's club.  970 So. 2d 470, 472-73 (Fla. 2d DCA 2007).  In this case, taking the inferences in Lock's favor, Lock was subject to threats and false accusations, leading to his termination.  Under Florida law, this type of conduct is not sufficiently outrageous, as a matter of law.  *Williams*, 877 So. 2d at 870-71; *Scheller,* 502 So. 2d at 1269-71; *Food Fair, Inc.*, 382 So. 2d at 151-53.  The Individual Defendants' motions for summary judgment are therefore granted as to Count V.

### 3.     *Tortious Interference with a Contractual Relationship*

In Count VI, Lock alleges that the Individual Defendants tortiously interfered with his contractual relationship with the City by making false accusations, intending to cause his

termination.  Doc. 43, ¶¶ 59-61.  The Individual Defendants argue that summary judgment is warranted on this claim because they were parties to Lock's contract and were therefore not capable of interfering with the contract, as a matter of law.  The Individual Defendants also assert that they possess absolute immunity.

Under Florida law, a claim for tortious interference with a contractual relationship requires: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) absence of any justification or privilege; and (5) damages resulting from the breach.  *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1998);  *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985).   As a general rule, "a tortious interference claim exists only against persons who are not parties to the contractual relationship." *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1099 (Fla. 1st DCA 1999) (internal quotation marks omitted).   In particular, a claim for tortious interference will typically not lie against a managerial or supervisory employee who terminates a plaintiff's employment, because he or she is considered a party to the employment relationship. *Id.*; *Alexis v. Ventura*, 66 So. 3d 986, 988 (Fla. 3d DCA 2011).   There is an exception, however, when the employee or representative "acts solely with ulterior purposes and without an honest belief that her actions would benefit her employer." *Cox*, 732 So. 2d at 1099; *Alexis*, 66 So. 3d at 988.

Lock maintains that the exception applies in this case because the Individual Defendants were acting solely to advance their own political agenda, and not in the City's best interest.  In the motions for summary judgment, the Individual Defendants fail to acknowledge or address the exception.  *See, e.g.*, Doc. 172, pp. 20-21; *see also* Doc. 108, pp. 6-7.  As detailed above, in connection with Lock's First Amendment claim, issues of fact exist as to whether Lock was

terminated because the Individual Defendants were pursuing their own political agenda. Accordingly, the Individual Defendants fail to demonstrate entitlement to summary judgment based on their status as parties to Lock's employment contract.  *See O.E. Smith's Sons, Inc. v. George*, 545 So. 2d 298, 300 (Fla. 1st DCA 1989) (holding that there was a factual question as to corporate officer's motives in terminating the business relationship).  Nonetheless, for the reasons set forth below, the Court finds that Rose and Eley are entitled to absolute immunity.  Hazlett is also entitled to absolute immunity, as to a portion of his challenged conduct.

Under Florida law, government officials have absolute immunity for defamation claims arising from statements made in connection with their official duties.  *Cassell v. India*, 964 So. 2d 190, 194 (Fla. 4th DCA 2007).  Florida courts have extended the immunity to other tort claims--- including claims for tortious interference with a contractual relationship---if the claim is simply a "recasting" or "retooling" of a defamation claim.  *Stephens v. Geoghegan*, 702 So. 2d 517, 525 (Fla. 2d DCA 1997) (applying immunity to claim for intentional infliction of emotional distress); *Goetz v. Noble*, 652 So. 2d 1203, 1205 (Fla. 4th DCA 1995) (applying immunity to claim for tortious interference with a contract).  Absolute immunity is based on the principle that it is "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation."  *McNayr v. Kelly*, 184 So. 2d 428, 431 n. 12 (Fla. 1966).

"The question of whether allegedly defamatory statements are absolutely privileged is one of law to be decided by the court."  *Stephens*, 702 So. 2d at 522.  In making this determination, the controlling question is whether the challenged communication was made "within the scope of the officer's duties."  *Cassell*, 964 So. 2d at 194 (internal quotation marks omitted).  The scope of an officer's duties is liberally construed, extending beyond "enumerated, required tasks," to

include "discretionary duties that are associated with a given position." *Stephens*, 702 So. 2d at 523; *Cassell*, 964 So. 2d at 194.   If a challenged statement falls within the scope of an official's duties, absolute immunity applies, "[h]owever false or malicious or badly motivated the accusation may be." *Hauser v. Urchisin*, 231 So. 2d 6, 8 (Fla. 1970) (internal quotation marks omitted); *Albritton v. Gandy*, 531 So. 2d 381, 387 (Fla. 1st DCA 1988).

In the Second Amended Complaint, Lock alleges that Eley, Rose, and Hazlett made "patently false accusations against him," with the intent of bringing about his termination.  Doc. 43, ¶ 61.  In the response in opposition, Lock does not dispute that his tortious interference claim is simply a "recasting" of a defamation claim, sufficient to implicate the defense of absolute immunity. *See generally* Doc. 99; *Stephens*, 702 So. 2d at 525; *see City of Stuart v. Monds*, 10 So. 3d 1134, 1134 (Fla. 4th DCA 2009) (holding that absolute immunity applied to a tortious interference claim even though plaintiffs did not plead a defamation claim); *Palm Beach Cnty. Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1093, 1096 n.2 (Fla. 4th DCA 2009) (observing that absolute immunity would provide an additional basis for judgment on a tortious interference claim based on an alleged conspiracy to deprive plaintiff of business).

The Court finds that Rose and Eley are entitled to absolute immunity because their challenged statements and actions fall within the scope of their official duties.  In his response in opposition, Lock maintains that Rose: (1) called to order the special meeting on December 5, 2011 to decide whether to place Lock on administrative leave; (2) wrote a news article about the Schrum incident; (3) mentioned Helms' "illegal campaign contribution" at the April 17, 2012 City Council meeting; and (4) voted to issue a negative performance evaluation, hold a due process hearing, and terminate Lock's contract. *See* Doc. 99 at 6-8.  As to Eley, Lock maintains that she: (1) publicly

called for Lock's resignation; and (2) voted to issue a negative performance evaluation, hold a due process hearing, and terminate Lock's contract. *See id.*

Pursuant to the City Charter, the City Council has the sole authority to terminate individuals it appoints to office, including the Chief of Police. *See* West Melbourne, Fla., Charter art. III, § 1(b) & art. XI, § 1. The City Council also has the authority to "make investigations into the affairs of the city and the conduct of any city department, office, or agency." *Id.*, art. III, § 1(c). As a result, Rose's and Eley's decisions to call a special meeting, give Lock a negative performance evaluation, hold a due process hearing, and terminate Lock's contract are, at the very least, "discretionary duties" associated with their positions. *Stephens*, 702 So. 2d at 523; *Cassell*, 964 So. 2d at 194. Although Lock responds that there is a factual dispute as to whether the Individual Defendants acted with a personal or political motive (Doc. 99, pp. 9-10), Florida courts hold that, as long as the challenged conduct falls within the scope of an official's duties, absolute immunity applies "[h]owever false or malicious or badly motivated the accusation may be." *Hauser*, 231 So. 2d at 8 (internal quotation marks omitted); *Albritton*, 531 So. 2d at 387.

The Court also finds that Rose is entitled to absolute immunity for the news article he wrote, which set forth a timeline of events relating to the Schrum incident and concluded that "the City Council may soon be required to consider how to judge the decisions the Chief made in his response to Commander Schrum's violation of the public trust." *See* 99-1, p. 65. Although the record does not suggest that writing a news article fell within Rose's mandatory duties, it was within Rose's discretionary duties to publicly disseminate information regarding the Schrum incident, a matter of public concern. *See, e.g, Stephens*, 702 So. 2d at 523 (holding that absolute immunity applied to officials' dissemination of information to news media regarding the investigation and discipline of a police officer involved in a shooting, a matter of public concern);

*Univ. Bd. of Trustees v. Monk*, 68 So. 3d 316, 319 (Fla. 1st DCA 2011) (holding that disclosure of an allegedly defamatory investigative report was privileged given the nature of the charges and defendant's status as a public university). Likewise, Rose's comment regarding Helms's campaign donation, made during a City Council meeting, fell within the scope of Rose's official duties. *See Grady v. Scaffe*, 435 So. 2d 954, 955 (Fla. 2d DCA 1983) (holding that defamatory remarks made by county commissioner during county commission meeting were privileged, despite the fact that they were unrelated to any pending business).

As to Eley's public demand for Lock's resignation, it is well-established that an official is entitled to absolute immunity for statements made in connection with an employee's discharge, including statements to the news media, if the official has responsibility for discharging the employee. *See, e.g., Barr v. Matteo*, 360 U.S. 564, 574-75 (1959) (holding that official had absolute immunity with respect to press release announcing his intention to suspend employees); *Hauser*, 231 So. 2d at 7-8 (holding that city commissioner's statements to the press about former city prosecutor were absolutely privileged); *Skoblow v. Ameri-Manage, Inc.*, 483 So. 2d 809, 810-11 (Fla. 3d DCA 1986) (holding that officials' negative statements to the press about plaintiff's work were absolutely privileged); *Danford v. City of Rockledge*, 387 So. 2d 967, 968 (Fla. 5th DCA 1980) (holding that absolute immunity applied where city officials made unfavorable statements to the news media about the plaintiff); *Stephens*, 702 So. 2d at 523; *see also Huszar v. Gross*, 468 So. 2d 512, 515 (Fla. 1st DCA 1985) (holding that official's statements to press that attorney's conduct was unethical and could result in legal action were absolutely privileged); *cf. Albritton*, 531 So. 2d at 387 (holding that statements about plaintiff's employment were not privileged where the official was not in charge of hiring and firing). Here, Eley had responsibility

for terminating Lock's contract, and the Court finds that her statements to the press were privileged.

With respect to Hazlett's challenged conduct, Lock's response in opposition identifies the following statements and actions: (1) on November 14, 2011, Hazlett forwarded the anonymous letter suggesting that Lock be investigated for the Schrum incident to City Manager Morgan and City Attorney Wilson, and later sent copies to all council members; (2) on November 18 and 19, 2011, Hazlett sent emails to Rose, City Manager Morgan, and City Attorney Wilson accusing Lock of covering up a felony; (3) Hazlett was quoted by the local media as calling for Lock to resign[17]; (4) at the December 5, 2011 special meeting, Hazlett voted to place Lock on administrative leave; (5) at the conclusion of the special meeting, Hazlett wrote a post on his Facebook page referencing "[t]he corrupt in law enforcement, lead [sic] by Chief Brian Lock," and stating the Lock was involved in a felony "cover up"; and (6) Hazlett voted to issue a negative performance evaluation, hold a due process hearing, and terminate Lock's contract. *See* Doc. 99 at 6-8.

For the reasons stated above in connection with Rose and Eley, the Court finds that Hazlett in entitled to absolute immunity with respect to his decisions to place Lock on administrative leave, give Lock a negative performance evaluation, hold a due process hearing, and terminate Lock's contract, as well as Hazlett's statements to the press regarding the Schrum incident.  Additionally, Hazlett's internal communications to other City officials regarding Lock's employment, including

---

[17] Specifically, Lock cites a news article in which Hazlett called on Lock to resign and for an investigation.  As to the Schrum incident, Hazlett stated: "I think it's outrageous. I think we should expect more from our police chief. . . . Our city has made so many wonderful strides. And I have to talk to people about our oldest employee in the city making bad judgments. It's really disturbing." Doc. 99-1, p. 52.  Lock cites a separate news report quoting Hazlett's "outrage" over the Schrum incident. *Id.* at 55.  Hazlett also testified during his deposition that he "freely spoke" to the media and publicly reiterated his opinion that Lock should be fired. Hazlett Dep., p. 71:4-13, 74:13-19.

the emails to council members, City Manager Morgan, and City Attorney Wilson, are absolutely privileged.  *See Cassell*, 964 So. 2d at 194-95 (applying absolute privilege where official internally reported and discussed plaintiff's possible fraud and criminal activity); *Stephens*, 702 So. 2d at 523 (holding that defendants' dissemination of information to fellow officers "clearly lies within the ambit of each's duties").

By contrast, the Court finds that Hazlett is not entitled to absolute immunity as to the statements contained in his Facebook post, excerpted in full in Section I.A.3., *supra*.  Because Lock alleges that the statements were made on Hazlett's Facebook page (Lock Aff., ¶ 2), they are distinguishable from remarks made in an official forum, such as a City Council meeting.  *Cf. Grady*, 435 So. 2d at 955.  Similarly, it does not appear that the statements involved dissemination of information to the public at large.  *Cf. Stephens*, 702 So. 2d at 523.  Hazlett's references to "phonies who claim to be my friend" and to Tice, his "new friend," further underscore the personal, rather than official, nature of the statements.  *See* Lock Aff., Exh. 1.

In the motion for summary judgment, Hazlett does not challenge the authenticity or admissibility of the statements, nor does he advance any rationale that would support a finding that the statements fell within his official duties.  *See generally* Doc. 173; *see also* Doc. 108.  The Court therefore denies Hazlett's motion for summary judgment on the issue of absolute immunity with respect to the statements contained in the December 5, 2011 Facebook post.  Because Hazlett has not moved for summary judgment on the sufficiency of the evidence to support Lock's tortious interference claim, the Court does not address whether the statements in the Facebook post would otherwise establish a tortious interference claim.

Based on the foregoing, Eley's and Rose's motions for summary judgment will be granted as to Count VI.  Hazlett's motion for summary judgment as to Count VI will be granted-in-part and denied-in-part as specified above.

4. *Florida Statute § 448.045*

In Count VII, Lock alleges that the Individual Defendants unlawfully conspired to terminate his employment, in violation of Fla. Stat. § 448.045.  Doc. 43, ¶¶ 65-72.  The Individual Defendants argue that this statute does not support a civil cause of action, and, alternatively, that they are entitled to statutory immunity pursuant to Fla. Stat. § 768.28(9)(a).  *E.g.*, Doc. 172, pp. 22-24.  In response, Lock requests dismissal with prejudice pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure.  Doc. 99, p. 14.  Lock's request is granted, and Count VII will be dismissed with prejudice.

## IV.    CONCLUSION

For the aforementioned reasons, the Court will grant the City's Amended Renewed Motion for Summary Judgment as to Counts II and III of the Second Amended Complaint, and deny the motion as to Counts I and IV.  Eley's and Rose's Renewed Motions for Summary Judgment are granted as to Counts V and VI of the Second Amended Complaint.  Hazlett's Renewed Motion for Summary Judgment is granted as to Count V of the Second Amended Complaint and granted-in-part and denied-in-part as to Count VI.  The Individual Defendants' motions are denied, as moot, as to Count VII, and Lock's request to voluntarily dismiss Count VII with prejudice is granted.

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1. The City's Amended Renewed Motion for Summary Judgment (Doc. 179) is

   **GRANTED in part** and **DENIED in part**.  As no genuine issues of material fact

   exist, the City's Amended Renewed Motion for Summary Judgment is **GRANTED**

as to Counts II and III of the Second Amended Complaint.  The City's motion is **DENIED** as to Counts I and IV.

2.  The Individual Defendants' Renewed Motions for Summary Judgment (Docs. 172, 173, 174) are **GRANTED in part** and **DENIED in part**.  As no genuine issues of material fact exist, the Individual Defendants' Renewed Motions for Summary Judgment (Docs. 172, 173, 174) are each **GRANTED** as to Count V of the Second Amended Complaint.  As to Count VI, the motions filed by Rose and Eley (Docs. 172 and 174) are **GRANTED**, and the motion filed by Hazlett (Doc. 173) is **GRANTED in part** and **DENIED in part** as set forth more specifically herein.  As to Count VII, the Individual Defendants' Renewed Motions for Summary Judgment (Docs. 172, 173, 174) are each **DENIED**, as moot.

3.  Pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure and Lock's request (Doc. 99, p. 14), Count VII is **DISMISSED with prejudice**.

4.  A Final Judgment will be entered at the conclusion of this litigation.

**DONE** and **ORDERED** in Tampa, Florida on April 24, 2015.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties